[Crim. No. 394. Fourth Appellate District.—March 29, 1940.]

THE PEOPLE, Respondent, v. ROBERT COWAN et al., Appellants.

Jerry Giesler, Ward Sullivan, Thornwell Rogers, Joseph W. Ryan and Morris Lavine for Appellants.

Earl Warren, Attorney-General, and R. S. McLaughlin, Deputy Attorney-General, for Respondent.

MARKS, J.—On September 14, 1938, the defendants and Morris Malter were indicted by the grand jury of Los Angeles County and charged with murder by killing John Stockton on December 15, 1931. They were tried in 1939. The jury found them all, except Morris Malter, guilty of murder in the first degree and fixed punishment at imprisonment for life. The trial judge granted the motion of Patrick Rollins for a new trial but denied like motions of the others. This appeal followed. During the trial the charge against Morris Malter was dismissed to permit him to become a witness against his codefendants. He testified at length for the People, becoming their most important witness.

We will omit any reference to any evidence concerning Patrick Rollins and will refer to the appellants as the defendants.

The killing grew out of and occurred in the course of a purported combination or association of cleaners and dyers in Los Angeles. The purpose of this association was to control, by unlawful means, the prices and practices of those engaged in that industry. The combination, amounting to a conspiracy, was first organized in 1925 or 1926, and lasted, under various names and with changing personnel, until 1938. Defendants Cowan and Gartler, wholesale plant owners, appear as active members of the various wholesale associations during the entire period. During this same period there were other associations in existence which consisted of retail cleaners and dyers, chain store dyers and cleaners, and tailors engaged in cleaning and dyeing.

The particular wholesalers' association in existence during 1931 and thereafter, is described in the record as the "Wholesale Plant Owners' Association", the "Cleaners and Dyers Plant Owners Association", and by other similar names. We will hereafter refer to each of the various wholesale plant owners' associations as "the association". Cowan was director and treasurer of the association and Gartler was one of its directors during the time particularly involved here, at least up to some time during the month of February, 1932, when Cowan resigned as treasurer. They are both pictured as very active in the affairs of the association and both demanded that it be strong and vigorous in the prosecution of its aims. (It should be understood that in our summary of the facts we are stating only such facts as tend to support the verdicts and judgments.)

The record is long and the briefs very voluminous. A multitude of purported errors are urged, many of them being repeated in the brief of each defendant. A few errors are urged as applying to an individual defendant or group of defendants. It is entirely unnecessary to detail or consider many of these alleged errors. We will only consider those we regard as most important. Generally speaking, they affect all defendants.

It is equally unnecessary to detail at any considerable length the great mass of testimony bearing on the activities of the various associations and the unlawful methods used to control the prices and practices of the trade. Our statement of these facts will be most general.

During the early history of these associations they attempted, by various unlawful acts, to control those wholesalers and retailers who were "out of line", that is, those who did not conform to the prices and practices prescribed by the association. Assaults were made on plant owners and their employees. Windows of their places of business were broken. Stink bombs were thrown. Clothes in the plants were damaged. These acts of sabotage were committed by hirelings, not by members of an association.

In 1927 or 1928, methods used in Chicago by racketeers in the same industry were investigated, Paul Mitchell going to that city to do so. It was found that metallic potassium could be concealed in clothes sent to be cleaned and this would cause fires during the cleaning process; that indelible dye, soluble in cleaning solvent, could be concealed in clothes and as a result all the clothes in a cleaning drum would be dyed; that acid could be sprayed from fire extinguishers or otherwise sprinkled on garments. Thereafter these methods of sabotage were added to those already being used.

Malter, a former resident of Chicago, came to Los Angeles in 1929 and purchased a cleaning plant. This plant was closed on orders of a fire marshal shortly after he failed to accept an invitation to join the association.

Edward Rollins came to Los Angeles in 1930, or early in 1931. He was accompanied, or followed, by Frank Fisher and Edward Freedman.

Rollins purchased a wholesale cleaning and dyeing plant. He later acquired other plants. Malter was employed as superintendent of his plants. Fisher and Freedman became associated with Rollins but did no regular work in the plants. Their work consisted of acts of sabotage in an effort to keep cleaners and dyers "in line".

Rollins' plants became members of the association though he attended but very few, if any, meetings. He and his plants were represented in these meetings by Malter.

In 1931 the members of the association, including Cowan and Gartler, wanted to form a strong organization to keep all cleaners and dyers "in line". Rollins was engaged to organize and head such an organization. Dues of two per cent of the monthly gross incomes of association members were levied to pay the expenses of this organization.

Actual acts of sabotage and assault were committed principally by Fisher, Freedman and other members of Rollins' "mob".

Malter's duties were largely confined to superintending Rollins' plants, attending association meetings, collecting money, and acting as a messenger and general utility man. Only on one occasion did he go with his associates to keep a driver of an association member "in line". The foregoing facts are drawn largely from the testimony given by Paul Mitchell, Stanley Stanton and Malter, who, by their own admissions, were active in the conspiracy to keep members of the trade "in line" by acts of sabotage.

The White Way Cleaners and Dyers was owned and operated as a wholesale and retail plant by W. J. Fairchild. He was a member of the association but was not always "in line". On ten or fifteen different occasions dye had been placed in clothes sent to his plant to be cleaned. He employed John Stockton as janitor and night watchman. Joseph P. Smith slept in the plant and acted as night watchman after Stockton left which was ordinarily around 10 o'clock each night. Fairchild owned a .32 or .380 calibre Colt automatic pistol which Stockton carried for his protection while in the plant acting as night watchman.

Malter testified that on about December 12, 1931, Gartler called on Rollins at his plant; that Rollins complained to Gartler that "he has not been getting any money to amount to anything recently"; that "he has got quite an organization, that he has got several men that he has got to take care of"; that in reply Gartler told Rollins, "just as soon as he (Rollins) straightens out the White Way Cleaners that the plant owners will be more than glad to come across with their weekly pay checks of two per cent"; that Rollins asked Gartler for acid and that Gartler promised to furnish it to him.

On December 14, 1931, Gartler again appeared at Rollins' plant. He told Rollins that he (Gartler) had no acid but that he had "made the arrangements for Mr. Cowan to furnish the acid for the White Way Cleaners job". Rollins sent Malter for the acid which Cowan gave him. Malter took the acid to Rollins. Fisher and Freedman were with Rollins at that time. Rollins and Fisher obtained some old clothes and curtains from a box in Rollins' plant and made them into a bundle by wrapping them in an old coat and tying its arms

together. Rollins, Fisher and Freedman left in an automobile taking the acid and bundle with them. (The foregoing particulars are all taken from the testimony of Malter.)

When Fairchild left his White Way Cleaners plant on the late afternoon of December 14, 1931, Stockton and Smith were there. Smith left during the early evening. Stockton was then engaged in emptying the pockets of clothes which had been brought in to be cleaned.

Smith returned to the plant at about 1 o'clock the next morning. He found Stockton lying dead on the cement floor near the place where he had last seen him. He called his employer by telephone.

Fairchild and the police reached the scene at about the same time. They found Stockton's body lying on the floor with his head turned to the left so that the right temple was up. A bullet had entered his head through the center of the right temple, passed through his head, emerging through the left temple. A distorted lead pellet, evidently the bullet which had killed Stockton, was found under or very close to his head. No weapon of any kind was near the body and the Colt automatic pistol usually carried by Stockton at the plant has not been seen since Fairchild gave it to Stockton. A bundle of old clothes containing curtains was found on a counter in the plant near the body. It was wrapped in an old coat which had the arms tied together. The bundle was not on the counter when Fairchild left the night before. After the killing, and while the bundle was in the possession of the Los Angeles police department, the clothes had become motheaten and had been burned and therefore were not produced in evidence.

The bullet was so distorted that the weapon from which it had been fired could not be determined. However, there is positive evidence that the bullet could not have been fired from any Colt automatic pistol. There is also evidence that it might have been fired from a .38 special Smith & Wesson revolver.

A .38 special Smith & Wesson revolver with all but one of its numbers filed off was found by the Los Angeles police in 1932 in a filing cabinet in a cleaning plant operated by Malter who testified that it had been placed in a drawer of the cabinet by Rollins on the morning of December 15, 1931. That a package containing a gun had been in the drawer of this

cabinet was established by the testimony of another witness who was not an accomplice.

Before proceeding to a consideration of the various questions of law involved here it should be remarked that the conspiracy which we have described lasted from 1926 to 1938 with various actors involved but with Cowan and Gartler always in the picture. The purposes of the conspiracy were to control, by the various acts of sabotage we have described, the prices and practices of those in the cleaning and dyeing industry.

Prior to the amendment of section 375 of the Penal Code in 1933 (Stats. 1933, p. 1168) the throwing of acid on clothes not being worn was a misdemeanor, as were other methods expressly used by the conspirators in carrying out the purposes of the conspiracy. The use of deadly weapons was not within the proven purpose of the conspirators. ■ Of course, if in the consummation of an express and unlawful purpose of the conspiracy, one of the conspirators goes outside of such express purpose and kills, the other conspirators cannot escape responsibility where, as here, such killing is not an unreasonable result to be expected from the acts of sabotage and violence which were contemplated. ■ Where persons are not actors in the actual commission of the crime charged, but aid and abet others in its commission or procure others to commit the crime, all are equally guilty. (*People* v. *Bond,* 13 Cal. App. 175 [109 Pac. 150].)

■ Since the conspiracy had as its purpose acts of sabotage, and as it lasted until 1938, the acts and declarations of the conspirators engaged in the conspiracy between the time of its inception in 1926 to its termination in 1938, were properly received in evidence even though many of those declarations were made after thé killing of Stockton in 1931. There was no conspiracy to kill. The killing was a not-to-be unexpected result of the unlawful acts contemplated by the conspirators. Because, on one other occasion, deadly weapons were used threateningly by two or more of the conspirators without the knowledge of other conspirators does not make the unlawful use of deadly weapons, or killing, a direct purpose of the conspiracy and an acknowledged means of accomplishing its ends so as to include within its purposes, assault with a deadly weapon, or murder, both of which crimes are felonies.

Mitchell was an active conspirator for six of the twelve years of the existence of the association. From 1930 to 1934, and after 1936, he had withdrawn from the conspiracy. Because he was a conspirator until 1930 or 1931, and from 1934 into 1936, or thereabouts, does not make him any the less a conspirator during the times he was active in its undertakings. However, he could not have been prosecuted for the murder of Stockton because he was not in Los Angeles and had abandoned the conspiracy at the time of the commission of that crime.

■ Defendants urge that there is a failure in proof of the *corpus delicti*. This contention is entirely without merit. In this character of case the *corpus delicti* is established when it is proved that the deceased met his end through criminal means used by a criminal agency. (*People* v. *Bollinger,* 196 Cal. 191 [237 Pac. 25].) "Proof of the *corpus delicti* does not necessarily involve or require proof that the crime was committed by the defendant, or the person charged with having committed it." (*People* v. *Ward,* 134 Cal. 301 [66 Pac. 372].) There is but one conclusion to be drawn from the evidence, namely, that Stockton came to his death through the criminal means of a criminal agency. He was shot through the head when his head rested on or near the cement floor. That he had not moved from the position in which he died is evident from the nature and direction of the wound and the condition and position of the bullet. These facts, together with the further fact that no weapon was found near him, eliminate the possibility of suicide and demonstrate that some person shot him to death.

■ Defendants argue that they were convicted on the testimony of accomplices which was not sufficiently corroborated to satisfy the requirements of section 1111 of the Penal Code. We have already summarized a few of the circumstances corroborating the testimony of the accomplices. We have read the entire record and have found therein many more circumstances and much testimony corroborating this evidence. We will not unnecessarily lengthen this opinion by detailing that evidence at this time. One attorney for three of the appellants strenuously argues the insufficiency of the corroborating evidence. In another portion of one of his briefs, while arguing another question, he aptly estimates the weight to be given the bundle of clothes found near the body

of Stockton, as follows: ''Also, if there were any attackers who left a bundle of clothes, as the prosecution claims, they would have taken away the clothes, because leaving such bundle would be like leaving a calling card.''

The evidence sufficient to legally support the testimony of an accomplice is considered and clearly set forth in *People* v. *Negra*, 208 Cal. 64 [280 Pac. 354]. (See, also, *People* v. *McLean*, 84 Cal. 480 [24 Pac. 32]; *People* v. *Martin*, 19 Cal. App. 295 [125 Pac. 919]; *People* v. *Barker*, 114 Cal. 617 [46 Pac. 601]; *People* v. *Bunkers*, 2 Cal. App. 197 [84 Pac. 364]; *People* v. *Taber*, 13 Cal. App. (2d) 27 [55 Pac. (2d) 1189]; *People* v. *Martinez*, 19 Cal. App. (2d) 599 [66 Pac. (2d) 161].) In the last cited case it is said: ''It is an established principle of criminal procedure that evidence corroborative of an accomplice's testimony implicating a defendant in the commission of a crime is not required of itself to establish guilt or to extend to every detail included in the accomplice's testimony but that it is sufficient to avoid the inhibition of section 1111 of the Penal Code, if, standing alone, it tends to connect defendant with the commission of the offense charged.'' Measured by these rules the corroborating evidence in the record must be held to be sufficient.

■ Defendants urge that Malter was impeached in almost every possible way; that he was a convicted criminal; that he was an admitted perjurer in another case; that he was a despicable character in every respect. They urge us to apply the rule announced in *People* v. *Bacos*, 14 Cal. App. (2d) 338 [58 Pac. (2d) 221], where Jose Gonzales, the witness who admittedly did the killing, testified in a first preliminary examination that defendants had not hired him to kill deceased, but in a second preliminary examination that they had hired him. At least twice during the trial of the defendants in that case, he testified that he had killed in self-defense and had not been hired to kill, and at other times in the same trial he testified that defendants hired him to kill. No such state of facts appears in the record before us, and, the evidence of Malter, although he is a much discredited witness, cannot be gauged by the same standards as that of Gonzales. The weight to be given Malter's testimony was first a question addressed to the jury, and second, to the trial judge on the motion for new trial.

■ Defendants complain because the trial court refused to instruct the jury that the witness Mitchell was, as a matter of law, an accomplice whose testimony must be corroborated by other evidence. We find no error in the refusal to give such an instruction.

As we have observed, Mitchell left the conspiracy about 1930 or early in 1931, and did not return to it until 1934. He was in San Francisco in December, 1931, and had no connection with any of the conspirators for some time prior to and after the killing of Stockton.

In 1915, section 1111 of the Penal Code was amended (Stats. 1915, p. 760) by the addition of the following sentence: ''An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.'' This amendment has changed the definitions of an accomplice appearing in earlier cases. ■ It is now held that to constitute a person an accomplice under the present definition of that code section, he must be properly liable to prosecution, that is, there must be probable cause for his prosecution ''for the identical offense charged against the defendant on trial'' in the case in which the testimony is offered. (See, *People* v. *Howell*, 69 Cal. App. 239 [230 Pac. 991].) It is clear that Mitchell could not be charged with the murder of Stockton for reasons already given. Therefore, he was not an accomplice of the defendants in the commission of the crime of killing Stockton, even though he might have been an accomplice of some of them in other crimes committed while he was an active participant in the conspiracy.

■ Defendants complain of evidence introduced over their strenuous objections concerning Ralph Sheldon who had received much unfavorable publicity in connection with the Caress kidnaping case. In that case Sheldon, with others, was subsequently found guilty and sent to the penitentiary. (*People* v. *Frank,* 132 Cal. App. 360 [22 Pac. (2d) 792]; *People* v. *Baillie,* 133 Cal. App. 508 [24 Pac. (2d) 528].)

Malter testified that while Sheldon was under arrest and in jail he and Rollins went to the office of a bail bond broker and attempted to assist in securing bail for him. Evidence was also admitted consisting of records of the Los Angeles County jail showing the several dates of Sheldon's admission

to and release from that institution including his last release when he was transported to San Quentin.

The only connection of Sheldon with the activities of the association was disclosed in Malter's testimony which we summarize as follows: That he took Sheldon to a meeting of the association directors or members; that the advisability of a strong and vigorous organization to keep cleaners and dyers "in line" was discussed; that Sheldon recommended himself as a suitable person to head such an organization and mentioned the names of known gangsters as references; that Sheldon demanded $25,000 in cash with which to start such an organization; that an association member (not a defendant) replied that all of the cleaners and dyers in California combined did not have $25,000 in cash; that Sheldon then left the meeting; that he had no further connection with the association.

It is clear that Sheldon never was employed by nor had any connection with the association. Giving bail for him, his various confinements in jail and his ultimate conviction and confinement in the penitentiary were not even remotely related to the charge on which defendants were being tried. It was error on the part of the trial deputy district attorney to even offer such evidence, knowing, as he must have known, that Sheldon could not have been connected with the charge against defendants. It was error on the part of the trial judge to admit such evidence over the objections of defendants. Defendants moved to strike the evidence from the record when all parties had rested. This motion should have been granted.

Defendants complain of the failure of the trial judge to incorporate in any of his instructions that portion of section 1111 of the Penal Code reading as follows: "And the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." They proposed such an instruction. It has been held that a defendant is entitled to have the jury informed by a proper instruction of the legal effect of this portion of the section. (*People* v. *Swoape,* 75 Cal. App. 404 [242 Pac. 1067] ; *People* v. *Brown,* 25 Cal. App. (2d) 513 [77 Pac. (2d) 880].)

The trial judge did, however, instruct the jury at least twice, in effect, that there must be evidence, independent of and apart from that of the accomplices, that in and of itself tended to connect a defendant with the particular and specific

crime charged, which was the murder of Stockton. Another instruction was given on corroborating evidence. In view of the instructions given we cannot see how the jury could have been misled by the failure to incorporate in any of the others the quoted sentence of section 1111 of the Penal Code. While it was error to omit that sentence or its substance from an instruction we cannot regard such error as prejudicial here.

 Defendants requested but the trial judge refused to give an instruction defining manslaughter, and also refused to submit to the jury the question of the guilt or innocence of the defendants of that crime. This is urged as serious error.

Defendants urge that the purpose of the conspiracy was sabotage, that is, the injury of personal property which is a misdemeanor; that as the killing was committed in the commission of a mere misdemeanor it comes within the definition of manslaughter contained in subdivision two of section 192 of the Penal Code.

This argument lacks proper foundation in law. The evidence is clear to the effect that defendants were engaged in a conspiracy to injure persons and property. Such actions come within the definition of ''crime'' as that word is used in subdivision one of section 182 of the Penal Code which defines and fixes the punishment for criminal conspiracy. The last paragraph of that section provides as follows: ''When they conspire to do any of the other acts described in this section they shall be punishable by imprisonment in the county jail or state penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both, and cases of such conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done.''

The particular crimes with which we are here concerned do not fall within the definition of the crimes defined in subdivisions two, three, four and five of that section. Therefore the crimes which we have grouped under the term sabotage fall within the classification of ''other acts'' described in the section. The punishment for a conspiracy to commit any of those ''other acts'' is imprisonment in the county jail or in the state penitentiary.

The question remains,—Was the conspiracy in which the defendants were engaged a misdemeanor or a felony where the punishment could be either confinement in the county jail or

in the penitentiary? This question was answered in the case of *Doble* v. *Superior Court,* 197 Cal. 556 [241 Pac. 852], where a similar question was considered. The Supreme Court there said: "A fair construction of section 17, in order to give effect to every part thereof, requires us to hold, and we do so hold, that in prosecutions within the contemplation of that section, the charge stands as a felony for every purpose up to judgment, and if the judgment be felonious in that event it is a felony after as well as before judgment; but if the judgment is for a misdemeanor it is deemed a misdemeanor for all purposes thereafter—the judgment not to have a retroactive effect so far as the statute of limitations is concerned."

As it seems clear that the conspiracy in which defendants were engaged must be defined as a felony, the killing in the course of the execution of that conspiracy could not have been regarded as manslaughter and the trial judge properly refused to submit that question to the jury.

 In this connection, counsel for Gartler, Fisher and Freedman presents a novel argument. He urges that the indictment charges murder, not murder in the consummation of a conspiracy; that defendants had no knowledge that there would be an attempt to prove a conspiracy until they heard the opening argument of the deputy district attorney at the commencement of the trial; that as a result of surprise and because they were given no time to secure evidence to rebut evidence of a conspiracy offered by the People, they suffered serious prejudice. This argument has foundation neither in law nor fact. It is settled law that where murder is charged it is permissible to show that the killing was done in carrying out the purposes of a criminal conspiracy among the defendants even though no conspiracy be charged. The record discloses that defendants were furnished transcripts of the testimony given before the grand jury. Sufficient portions of that transcript were read into the record to show that it disclosed that the charge of murder was founded on evidence that it was committed in carrying out the purposes of such a conspiracy.

Defendants complain of numerous acts of alleged misconduct on the part of the trial deputy district attorney during his arguments to the jury. It must be admitted that he was overzealous, not only in his argument but on occasions during the taking of evidence.

 Without detailing all of the instances of alleged misconduct in the arguments it should be sufficient to say that on each occasion, except one, when objections were made to any prejudicial statement the trial judge promptly sustained the objections and instructed the jury to disregard the statements. This cured the errors as none of them were so serious as to be incurable by such instructions.

The statement which was allowed to stand occurred during the opening argument of the deputy district attorney when he was discussing the credibility of Malter, his most important witness. Among other things he stated: ''I take this responsibility and say unto you, that we are not putting on that kind of a man before you and asking you to believe that that we do not believe ourselves, that we are not absolutely convinced of, and I will tell you I am saturated with the confidence and the knowledge that Morris Malter has told you the truth about what this conspiracy was about.''

It should be admitted that the attorney should not have stated that he had *knowledge* that Malter was telling the truth. Otherwise the statement is nothing more than a summary of what should be common knowledge of the ethics to be used by a reputable prosecutor. No such official should attempt to convict defendants on evidence that he does not believe to be true. This portion of the argument was innocuous and could not be regarded as prejudicial. The insertion of the single word ''knowledge'' into what was otherwise a harmless argument hardly had sufficient emphasis, when taken with the context, to mislead the jury, especially in view of the many and often-repeated instructions to the jury that they could not consider any statement of counsel as evidence nor give it any weight as such.

 There are errors of law in the record. In accordance with the mandate of section 4½ of article VI of the Constitution, we have studied the entire reporter's transcript and are left with the firm opinion of the guilt of the defendants and that no injustice has been done to them except in fixing the degree of their crimes. Therefore, under section 4½ of article VI of the Constitution, we cannot reverse the judgment.

The evidence supporting the testimony of the accomplices was given by many witnesses. Some of it was supported by Rollins, Cowan and Gartler when they appeared as witnesses. We need to refer to but little of it.

A few days after Stockton was killed, Rollins moved from the apartment where he had lived for some time to another apartment where he lived for a number of months under an assumed name. He was arrested in Chicago and for a time resisted extradition. He swore to and his attorney filed an affidavit in which Rollins falsely denied being in California in December, 1931. It was proven that he owned revolvers and went armed, which fact he denied. His evidence and statements were proven false in other particulars.

There is much corroboration as to Cowan. Besides being a member, director and treasurer of the association and advocating a strong and vigorous organization to keep cleaners "in line", there are circumstances other than those to which we have already referred. In 1932 he engaged and paid an attorney to represent Malter on the hearing for violation of probation. When Malter was released from jail Cowan furnished his transportation to Chicago and money for expenses on the trip. He solicited a cleaner to raise his prices and told him he had better have his prices changed. This witness testified that Cowan said to him: " 'You had better have your prices changed by Monday; if not, it will happen to you what happened to Fairchild.' Then at that point I asked him, 'What happened to Fairchild?' because I know that different things happened to Fairchild. One thing was that they put him out of business, and the second was that . . . killed the watchman. And then he says, 'You remember the watchman,' and as he said that I walked away and let him stand there, and I couldn't talk with him any more. That was the last conversation I had." The same witness testified to repeated acts of window breaking and acid throwing and that "I would not say so, that he (Cowan) broke them, because it would be impossible for me to say, because I have not seen him breaking—anybody breaking the windows, but whenever I come down the windows they were broken, and it always happened, that it was after a threat."

Gartler was also implicated by much evidence, some of which we have already mentioned. Among several other circumstances we mention the following. He accepted appointment on an association committee to serve with Malter and others which, at the request of a plant owner, went to Pasadena to keep a driver "in line" who threatened to take his route to another plant. While there was no serious violence on this

occasion, the attitude of the members of the committee towards the driver was so threatening that the driver left the plant and did not return, thus abandoning the route which he claimed as his own. Further, Mitchell testified that he stored dye, metallic potassium and acid, which he obtained for the association to be used for purposes of sabotage, in the plant owned by Gartler and his partner, Jacob Hutner. Hutner testified that he buried these chemicals on the grounds of the plant because he was afraid of fire. He also testified that he told Gartler of the incident. No complaint was made to the authorities and the incident remained a secret until shortly before the indictment was returned in this case. Then the chemicals were dug up by officers at a place pointed out by Hutner. Gartler admitted full knowledge of these circumstances.

It seems clear that Fisher and Freedman were actually employed by Rollins and committed many of the acts of sabotage.

With this evidence before us we cannot consider the errors of law occurring during the trial as sufficiently prejudicial as to have resulted in a miscarriage of justice.

■ In our study of the record we have failed to find satisfactory evidence of premeditation in the killing to support the verdicts and judgments of murder of the first degree. (Sec. 189, Pen. Code.) The circumstances surrounding the actual act of killing are undisclosed. We know that it was not "committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem." (Sec. 189, Pen. Code.) Defendants should have been found guilty of murder of the second degree. This "injustice may now be righted without subjecting the state and the defendant(s) to the delay and expense of a new trial." (*People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609].)

The judgments of the lower court, of murder of the first degree, are modified. The cause is remanded to the trial court with directions to enter judgment against each who is an appellant here finding him guilty of murder of the second degree, and to thereupon pronounce judgments upon them and each of them as prescribed by law. The orders denying the motions for new trial are affirmed.

Barnard, P. J., and Griffin, J., concurred.

Petitions for rehearing of this cause were denied by the District Court of Appeal on April 12, 1940, and the following opinion then rendered thereon:

THE COURT.—Defendants have filed petitions for rehearings in which they attack the correctness of the statement of facts contained in the opinion filed in this case.

We have reviewed the record with these criticisms before us and are satisfied that, with one exception, all the facts set forth are supported by the testimony of one or more witnesses or reasonable inferences to be drawn from the evidence.

In speaking of the preparations made at the Rollins plant on the late afternoon of December 14, 1931, prior to the killing of Stockton at the White Way Cleaners plant, it was stated in the opinion that ''Rollins, Fisher and Freedman left in an automobile taking the acid and bundle with them''. There is no evidence supporting the statement that the three men left in an automobile and took acid with them. A bundle of old clothes, similar to the one made up by Rollins and Fisher at the Rollins plant, was discovered in the White Way Cleaners plant at the time Stockton's body was found. Just how this bundle was transported to the scene of the killing, whether by automobile or otherwise, does not seem of sufficient importance to require a rehearing.

Complaint is also made of our failure to consider in detail all of the multitude of purported errors urged by defendants. We still are of the opinion that it is unnecessary to discuss in detail errors and alleged errors occurring during the trial, other than those already considered, as those errors could not affect the final results of the appeals.

The petitions for rehearing are denied.

Petitions by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, were denied by the Supreme Court on April 25, 1940. Houser, J., and Carter, J., voted for a hearing.