[Crim. No. 6191. Second Dist., Div. One. Nov. 21, 1958.]

THE PEOPLE, Respondent, v. ARTHUR DONALD KELLER, Appellant.

*Assigned by Chairman of Judicial Council.

Taylor, Sherman & Heller for Appellant.

Edmund G. Brown, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendant Keller and Tanju Dilek were each charged in separate informations with one count of conspiracy to cheat and defraud by criminal means and three counts of grand theft. The conspiracy charged in Count I arose out of certain activities of defendant and Tanju Dilek resulting in six overt acts of securing fraudulent credit charge accounts during 1957 at the following business establishments: Lerners Clothing Store, July 9; the Diner's Club, July 5, through which a car was rented from Hertz U-Drive Co., July 12; Bonds Clothing Store, July 19; Phelps-Terkel, July 18; Lane Bryant, July 17; and Regal Fur Company, July 17. Counts II, III and IV respectively charged the theft of silverware valued at $445 from Parmelee-Dohrmann Co., July 19, 1957; a mink stole valued at $910 from Regal Furs, July 17, 1957; and over $200 in money from the Diner's Club and Hertz U-Drive, July 9, 1957.

The two cases were consolidated for trial and both parties were convicted by a jury on separate informations on all counts as charged. Defendant Keller was sentenced to the state prison. He appeals from the judgment of conviction and sentence.

Appellant contends that the trial court erred in admitting against him ''conversations'' of his wife, Tanju Dilek Keller; the judgment of conviction is void because a husband and wife cannot be the sole parties to a conspiracy; it was error to admit evidence of ''crimes'' outside the State of California; and the evidence is insufficient to sustain his conviction on Counts II, III and IV.

As to appellant's first and second contentions, on the issue whether evidence could be offered on the conspiracy charge, trial by jury was waived on the question of the validity of the purported marriage between appellant and Tanju. The matter was heard before the trial of the main case.

It is undisputed that appellant was legally married to Shirley; that he entered into a marriage ceremony with Tanju in Nevada March 14, 1957, and that four months later, on July 29, 1957, in Los Angeles County Shirley obtained an interlocutory decree of divorce from appellant. Appellant sought to establish a ''putative marriage'' by offering evidence that when Tanju entered into the ceremony she believed appellant was free to marry and her marriage would be valid. The trial court expressly found the purported marriage to be ''bigamous'' and void, and ruled that evidence could be admitted on the conspiracy charge.

Appellant again seeks to invoke the ''putative marriage'' theory in support of his first two contentions herein, claiming that Tanju, having entered into the marriage in good faith, is entitled to the rights of a putative wife. An examination of the record discloses no express finding of the trial judge that a putative marriage existed. Although he discussed the doctrine of putative marriages, emphatically rejecting the relationship as a legal defense in a conspiracy charge and properly limiting its application to the preservation of the rights of an innocent party to property acquired as the result of such a union, he expressly found the relationship to be a ''bigamous marriage.'' Although Tanju's good faith was a factual issue to be determined by the lower court it is obvious that implied in its express holding and subsequent ruling is the further finding that it did not accept defendant's evidence in that regard and that no putative marriage existed.

On the undisputed evidence it is clear that under the laws of Nevada such purported marriage was bigamous and void. The belief that Tanju could contract a valid marriage with appellant, even if found to exist by the trial court, is of little value here for, even if a "putative marriage" existed for the purpose of protecting property rights, it would not alter the illegality of the union itself, either in Nevada or in this state.

■ Appellant argues it was error for the trial court to receive in evidence, People's Exhibit 1, a ledger sheet of the Bank of America, Laurel-Sunset Branch, in the name of Tanju Dilek reflecting her deposits, withdrawals and the number of checks returned without payment, because it constitutes "conversations of the wife, Tanju Dilek Keller, against the husband, Arthur Donald Keller," inadmissible under section 1881, subdivision 1, Code of Civil Procedure. Clearly, the provisions of this section are not applicable to the bank's document. ■ Section 1881, subdivision 1, grants only two distinct privileges, "(a) the privilege making husband or wife incompetent as a witness in an action for or against the other; (b) the privilege against testifying to communications between husband and wife." (*In re DeNeef*, 42 Cal.App.2d 691, 693 [109 P.2d 741].) ■ It is obvious that the bank's ledger sheet is not a "conversation" or "communication" between a husband and wife as contemplated under that section and is not privileged.

■ It is also too clear for argument that the privilege under this section requires a valid marriage. ■ The purported marriage between appellant and Tanju being bigamous, it was illegal and void from the beginning. In *People* v. *Glab,* 13 Cal.App.2d 528, the court found the second marriage bigamous and void and held at page 535 [57 P.2d 588] : ". . . that the purported marriage between the witness Steeger and appellant Steeger was in fact no marriage at all, that the witness and Clara Steeger were not husband and wife and that he therefore might testify against her unrestricted by the limitations of sections 1881 of the Code of Civil Procedure and 1322 of the Penal Code, followed inescapably." Appellant's effort to extend the right of a putative wife beyond that of purely property matters and apply the provisions of section 1881, subdivision 1, is not only contrary to the context of the section itself but to the court's interpretation thereof. In addition there is no "right" as such

involved in this section; only a privilege in favor of the other spouse is granted thereunder.

We conclude not only that People's Exhibit 1 is not a privileged "communication" under section 1881, subdivision 1, but there is before us no such valid marriage as would support one if it existed.

In advancing his next contention that since husband and wife cannot be sole parties to a conspiracy the "putative" marriage renders the conviction void, appellant cites no authority, but relies on general public policy. Having held that the purported marriage between the parties was void and that the reviewing court will not disturb the implied finding of fact in support of the conviction that a putative relationship did not exist, we dispose of appellant's argument by referring to *People* v. *Little*, 41 Cal.App.2d 797, at page 800 [107 P.2d 634, 108 P.2d 63] : "The attorney-general concedes that a husband and wife cannot conspire together to commit a crime (See *People* v. *Miller*, 82 Cal. 107 (22 P. 934) ; *People* v. *MacMullen*, 134 Cal.App. 81 (24 P.2d 794).) To give life to this rule the alleged conspirators must actually be husband and wife which implies a *valid* marriage. Because a man and woman, not legally qualified to be married to each other, go through a void marriage ceremony, cannot make them husband and wife.

"Subject to certain exceptions not appearing here, section 61 of the Civil Code declares void a purported marriage between a man and woman when either or both of them have living an undivorced wife or husband." (Emphasis added.)

Consideration of appellant's remaining points requires an enumeration of facts leading up to defendant's arrest. Recounting the evidence in the light most favorable to the prosecution, we find a rather simple scheme carefully executed by appellant and Tanju Dilek to defraud numerous business establishments within a short period.

On July 5, 1957, Tanju Dilek, unemployed, filed a credit application with the Diner's Club, requesting "rush" service because she was going on a vacation. In reliance on statements made by her in the application, a credit card was issued on July 9. Thereafter she was sent three statements, the last, September 4, 1957, reflecting an unpaid total of $1,947.83, part of which ($1,309.08) was a charge by Hertz U-Drive representing the rental of a Cadillac by appellant in Los Angeles on July 11, 1957.

One of the references given by Tanju in securing the

Diner's Club card was the Bank of America, Laurel-Sunset Branch, in which she carried a small commercial account which was overdrawn on July 22 and on July 26; 31 checks written by her had been returned by the bank to the payees, leaving a $43 charge against her. Her savings account on July 19, 1957, showed $10 on deposit.

On July 16, 1957, appellant, also unemployed, under the name of Donald Heller, by telephone set up through a telephone answering service a fictitious nonexistent business called Pacific Finance and Building Company. Tanju, as his "secretary," appeared in the office of the answering service and obtained a form to be filled out for a business address. Pending its return, the answering service issued to appellant the telephone number WE 8-2901, which was used by Tanju and appellant. Various calls were received and recorded for Pacific Finance and Building Company, some from Regal Furs, all of which appellant returned as Donald Heller representing that company.

In establishing credit, obtaining goods and services and issuing fictitious checks, the modus operandi was much the same differing slightly on the type of merchandise involved, whether a down payment was required and whether credit was extended after appellant and Tanju had picked out the merchandise; but it generally followed that used by them in securing a mink stole valued at $910.76 from Regal Furs, the subject of the grand theft charge in Count III.

On July 17, 1957, Tanju picked out and arranged to purchase a stole on credit at Regal Furs. The next day she and appellant entered the store at which time he became involved in a discussion concerning her choice. When the owner questioned Tanju about her credit application, she gave him a three-year "employment" with Pacific Finance and Building Company, earning approximately $600 per month, and the Webster number at which he could contact her boss, Donald Heller, and supplied as her references Donald Heller, the Diner's Club, and charge accounts at other stores (which she had obtained in the same fashion). Appellant, upon being questioned, told him his name was Arthur Keller, employed at Pacific Materials Company, that he had no connection with Tanju and was only chauffeuring her for the day. The owner tried to contact Donald Heller through the Webster number leaving his number with the exchange. Later appellant called him, identified himself as Heller, and said that Tanju had

worked for Pacific Finance and Building Company three years, making around $600 per month as his secretary. On this transaction, Tanju gave Regal Furs two checks, one for $110 on July 17, 1957, and one for $100 the next day, both of which were dishonored by the bank pursuant to ''stop payment'' instructions issued by Tanju at the behest of appellant. Regal Furs received no money on account of the fur and was unable to again contact either party. The stole was later found in appellant's luggage.

Around the middle of July, 1957, appellant and Tanju went to the credit office of Parmelee-Dohrmann for a credit application. It was returned by Tanju and on July 17, 1957, they both picked out of stock and purchased a silver service for $445.13, the subject of Count II. Tanju signed the conditional sales contract and appellant suggested to the store the amount of payments. She issued a check for $150 on down payment. A few days later the check was returned by the bank. The silver, too, was found in their luggage upon their arrest in New York.

During July, especially around the 17th, 18th and 19th, appellant and Tanju purchased from various stores thousands of dollars worth of merchandise. Tanju alone sometimes made the initial contact, but appellant was present on most occasions when credit arrangements were made, or personally participated with her in securing credit and choosing and making the purchases. Neither had any funds then with which to pay the charges they had incurred or to cover the 31 checks written by Tanju. During this time on false credit applications, based primarily upon her fictitious employment and Diner's card, they obtained merchandise mostly on credit and often partially paid with fictitious checks, from Coulters, Lane-Bryant; Phelps-Terkel; B. Blank and Company, dba Nancy's; Lerners Beverly Hills and Downtown; Bonds, Wilshire and Hollywood; Knobby Knit Shops; Broadway Hollywood Store; Sid Colburn; Desmonds; Silverwoods; I. Magnin; Regal Furs; Parmelee-Dohrmanns; Diner's Club and Hertz U-Drive. Appellant and Tanju were unemployed and Pacific Finance and Building Company was entirely fictitious with no business location. The name Donald Heller was assumed by appellant and used by him to set up the fictitious business with the answering service for the express purpose of establishing a credit rating in Tanju's name, because his own was not good. Tanju had come from Turkey as a student and after their purported marriage in March they lived together as Mr. and

Mrs. Arthur Keller. They intended to go to Turkey, appellant having filed application for the issuance of a passport.

Shortly after July 20, 1957, appellant and Tanju left in the Cadillac obtained from Hertz U-Drive for New York. Appellant used Tanju's Diner's Club card wherever he could at restaurants and hotels across the country. In New York they immediately made arrangements to go to Turkey by boat, but later, upon being informed police were looking for him, appellant tried to arrange to go by plane, but before arrangements were made they were arrested in New York on July 31, 1957, with 13 suitcases carrying 212 articles weighing 387 pounds, including the mink stole and silver. The police also found in appellant's possession the Cadillac belonging to Hertz U-Drive. When asked by police whose idea it was to ''set up'' the fictitious business, appellant answered it was no one's idea, but just happened. He also stated that it was done to give Tanju a place of employment so she could secure credit and since they were going to Turkey and needed some things they thought they would be out of the country before anyone found out about the ''bum'' checks and false information. He said they intended to send money back to pay their bills once they got to Turkey. They admitted, however, they did not advise any store or the Diner's Club they were going to Turkey or where they could be billed for the merchandise, nor did they save bills or sales slips to determine how much was owing to each store. They both knew Tanju had not sufficient funds in the bank to cover the checks when they were written, but thought that they would be returned and added to their various charge accounts. Appellant said he taught her how to write checks and suggested she stop payment on the two checks given to Regal Furs.

Their defense at the trial was that when they arrived in Turkey they intended to pay all charges and were merely establishing credit by giving false job information.

Appellant has advanced the position that the trial judge erred in admitting evidence as to ''crimes occurring outside the state of California.'' In this connection the prosecution, over the objection of appellant, introduced evidence of monthly statements rendered by the Diner's Club, which included certain items incurred on charges made by Tanju and appellant outside the state of California on their trip to New York. (People's Exhibits 5, 6, 7, 8.) These charges constitute the evidence of ''crimes committed outside the state'' appellant refers to. These exhibits were relevant to

the conspiracy charge in Count I, but the charges out of the state reflected by the statement were incurred after overt act Number 1 occurred. Appellant relies on *People* v. *Buffum*, 40 Cal.2d 709 [256 P.2d 317], and *People* v. *Aragon*, 154 Cal. App.2d 646 [316 P.2d 370]. The Aragon case has no application to the situation at bar, but the Buffum case actually supports the trial court's ruling. We refer to pages 719-720 of the opinion: ''The evidence meets the requirement of section 184 of the Penal Code that some act, other than the making of the agreement, must be done in California to effect the object of the conspiracy. . . . Under this evidence, if the agreement was to have abortions performed in California, an offense was completed when the agreement was followed by the acts in this state (Pen. Code, §§ 182, 184), and the subsequent transportation of the women across the border into Mexico for performance of the abortions did not operate to nullify the acts which had already been done in California.''

The record is clear that the conduct giving rise to the conspiracy with Tanju began around June 27, 1957, and continued until their flight from California about July 20, 1957. It started with the opening of charge and credit accounts in various stores based primarily upon a small bank account in Tanju's name, the establishment of the fictitious business and employment and the securing of the Diner's card. Tanju fraudulently secured the Diner's Credit Card on or about July 5, 1957, the Club relying upon the statements in her credit application and her small bank account. Credit was extended in the sum of $1,947.83. Appellant, on July 11, 1957, using Tanju's Diner's card, rented from Hertz U-Drive in Los Angeles, a Chevrolet sedan. The next day, appellant returned with her and exchanged it for a 1957 Cadillac, which he charged to Tanju's Diner's card. It was used by them in Los Angeles until they left around July 20, 1957, when they drove it to New York. An overt act pursuant to the conspiracy occurred when the Diner's card was procured by false information on July 5, 1957, in Los Angeles and directly used by appellant and Tanju to rent the Cadillac automobile on July 12, 1957. They also used the Diner's card to charge dinners at the Bit of Sweden and a Magnavox radio and records at Wallichs Music City. Indeed this constitutes ample evidence of an overt act pursuant to the conspiracy long before they left Los Angeles and expenses were incurred by them outside the state of California and charged on the Diner's Club card.

Interestingly enough, on cross-examination of appellant, without any objection, he readily admitted he used Tanju's Diner's card to stay at Delmonico's in New York, at motels in Ohio and Las Vegas, used it at the Chez Paree in Chicago and just about every place he could across the country, which admission appears to render entirely without merit the objection that "the introduction of evidence relating to crimes committed outside the state of California was improper for the reason that appellant was not afforded the right of cross-examination of any witnesses to said alleged crimes committed outside the state of California." Certainly under such circumstances, no prejudice could have resulted to appellant from the introduction of Exhibits 5, 6, 7 and 8, in the first instance, which disclosed no more than he freely admitted on cross-examination.

Appellant's last contention that "the judgment as to Counts II, III, and IV, is not sustained by the evidence" amounts to no more than the argument that the purchases made, checks issued, credit secured and fraudulent representations made in connection therewith were the sole acts of Tanju and she alone was responsible for the theft of the silver service, mink stole and money. A principal is defined in section 31, Penal Code, as: "All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet its commission. . . ." In *People* v. *Cowan*, 38 Cal.App.2d 231, at page 239 [101 P.2d 125, 135], the court supported this definition: ". . . Where persons are not actors in the actual commission of the crime charged, but aid and abet others in its commission or procure others to commit the crime, all are equally guilty. (*People* v. *Bond*, 13 Cal.App. 175 [109 P. 150]." In the instant case, the showing is much stronger. We have hereinbefore recounted in detail the evidence relating to the transactions covering the silverware at Parmelee-Dohrmann, the mink stole at Regal Furs and money from the Diner's Club and Hertz U-Drive, and appellant's participation in all three. The record is replete with evidence, adduced not only through eyewitnesses but from appellant himself that he was present at and/or personally participated in most of the transactions in securing credit and making purchases; he knowingly and intentionally set up the false factual background for Tanju's employment and salary in order to secure credit because his own was not good; that under a fictitious name he represented

himself as Tanju's employer; that he and Tanju used the Diner's Club card in Los Angeles and took the Hertz car he had obtained thereon to New York; he taught Tanju to write checks and knew there was no money to cover the charges he and Tanju had incurred; and it was appellant's idea to stop payment on checks to Regal Furs. As to the weight to be given this and the other evidence hereinbefore recounted, " ' (W)e must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) The record before us discloses without question that there is more than ample evidence that appellant was a principal in the crimes charged in Counts II, III, and IV.

For the foregoing reasons the judgment of conviction on all counts is affirmed. The attempted appeal from the sentence is dismissed.

White, P. J., and Fourt, J., concurred.