[Crim. No. 4526. In Bank. Oct. 31, 1944.]

THE PEOPLE, Respondent, v. HENRY HARDING HOLT,
Appellant.

Ward Sullivan and Jerry Giesler for Appellant.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

SCHAUER, J.—The defendant was charged with the murder of Romie L. Riley. He pleaded not guilty and not guilty by reason of insanity. A jury found him guilty of murder of the first degree and made no recommendation as to penalty. The issue of defendant's sanity was then tried and the jury found that he was sane at the time of the commission of the crime charged. The trial court denied the defendant's motion for a new trial and sentenced him to death. This appeal from the judgment is automatic. (Pen. Code, § 1239(b).)

The defendant attacks the judgment upon two grounds. He contends: (1) that the trial court failed to instruct the jury adequately upon the law as to self-defense; (2) that the evidence is insufficient to sustain a judgment of murder in the first degree, at most establishes murder in the second degree, and that the judgment, accordingly, pursuant to the power vested in us by section 1181 of the Penal Code, should be reduced from death to imprisonment for the term prescribed by law for murder of the second degree. We conclude that the first point cannot be sustained but that the second one is meritorious.

The contention that the jury was inadequately instructed as to the law of self-defense is based on the fact that the jurors were not told that the defense could be established even though a person, being feloniously assaulted, did not retreat but stood his ground. The commission of the homicide was admitted by defendant and the only issue as to its unlawfulness was the claim that he acted in self-defense.

The defendant testified, as hereinafter related in more detail, that immediately preceding the shooting the decedent, Riley, advanced toward him, coming around the end of a flatcar, which had been between them, picked up a club and continued advancing after being told by defendant to stand back. Defendant fired one shot into the ground and then, as Riley continued to advance, when at a distance of about fifteen feet, defendant fired again, wounding the decedent in the abdomen. Riley stopped advancing and defendant ceased shooting. Under cross-examination of defendant it was brought out that he did not at any time seek to retreat, go on his way, or otherwise decline the encounter.

The only instruction given as to self-defense was "that the mere apprehension of danger is insufficient to justify a homicide. The fear, if any, must have been produced by circumstances such as would be sufficient to excite the fears of a reasonable person. The law of self-defense is founded on necessity, and in order to justify the taking of life upon that ground, it must not only appear to the slayer as a reasonable man, that he had reason to believe, and did believe, that he was in danger of his life, or of receiving great bodily harm, but it must also appear to his comprehension, as a reasonable man, that to avoid such danger, it was *absolutely necessary* for him to do the act which he in fact did do." (Italics added.)

█ It is the settled law of this state that one who without fault is exposed to a sudden, felonious attack need not retreat; he may in the exercise of his right of self-defense stand his ground and slay his assailant. (*People* v. *Orosco* (1925), 73 Cal.App. 580, 598 [239 P. 82]; *People* v. *Kinowaki* (1940), 39 Cal.App.2d 376, 379 [103 P.2d 203]; *People* v. *Campanella* (1940), 39 Cal.App.2d 384, 387 [103 P.2d 193]; *People* v. *Zuckerman* (1942), 56 Cal.App.2d 366, 373 [132 P.2d 545]; 13 Cal.Jur. 649-651, § 49, and cases there cited.) "The right to stand one's ground should form an element of the instructions upon the necessity of killing and the law of self-defense." (*People* v. *Hecker* (1895), 109 Cal. 451, 467 [42 P. 307, 30 L.R.A. 403].)

The use of the phrase "absolutely necessary" as it is employed in the instruction given, although it has been often upheld under the circumstances of particular cases, has been condemned. In *People* v. *Carmichael* (1926), 198 Cal. 534, 549 [246 P. 62], this court criticized an instruction that "to justify a person in killing another in self-defense, it must appear that the danger, either real or apparent, was so urgent and pressing that, in order to save his own life . . . or to prevent himself . . . receiving great bodily harm, the killing of the other was *absolutely* necessary." Such use of the word "absolutely," it was said, "might have the effect of leading jurors to believe that, to bring it within the right of self-defense, the act of killing must have actually been necessary. Such an impression of the law would of course, be erroneous, since there may be a justifiable homicide where the actual necessity for killing is not present . . . [T]he elimination of the word 'absolutely'

in the connection in which it is used in the instruction under review is recommended."

█ The instruction given herein, however, is less open to such criticism than the instruction there disapproved. As stated in *People* v. *Acosta* (1937), 21 Cal.App.2d 57, 61 [68 P.2d 298], where an instruction similar to that in the present case was under consideration, "Preceding the use of the word 'absolutely' there is a clear and direct statement that it must so appear to the appellant as a reasonable man, and that he had reason to believe, and did believe, etc., and that it appeared to his comprehension as a reasonable man that to avoid such danger it was absolutely necessary to take the life of the deceased. It is all based upon the reasonable appearance, not upon the absolute fact of such a necessity existing." Under the circumstances of this case we are satisfied that the inclusion of the words "absolutely necessary" in the instruction as given did not prejudice the defendant.

█ The attorney general calls attention to the fact that no special instruction on the law of self-defense was requested by the defendant but we consider that fact immaterial. It has been said (*People* v. *Scofield* (1928), 203 Cal. 703, 709 [265 P. 914]) that the following statement appearing in 8 California Jurisprudence at page 309 "is conceded to be the general rule": "It is the duty of the court in criminal cases to give, of its own motion, instructions on the general principles of law pertinent to such cases, when they are not proposed or presented in writing by the parties themselves. But it is not its duty to give instructions upon specific points developed through the evidence introduced at the trial, unless such instructions are requested by the party desiring them." The People contend that the right of an accused to stand his ground is a special issue raised during the trial and that an instruction thereon need not be given unless requested by the defendant. The quoted language, however, does not represent a complete statement of the applicable rule. As stated in *People* v. *Putnam* (1942), 20 Cal.2d 885, 890 [129 P.2d 367], "It is incumbent upon a court in a criminal case to instruct the jury of its own motion, charging them fully and fairly upon the law relating to the facts of the case. [Citations.] The court is not relieved of the duty to give instructions whose necessity is 'developed through the evidence introduced at the trial.' [Citation.] An instruction is necessary if it is vital to a

proper consideration of the evidence by the jury. [Citations.]" We therefore consider the question on the same basis as though an instruction on the subject had been specially requested by the defendant.

■ It is urged that on defendant's version of the matter, which the jury had a right to believe, he had a right to stand his ground, and as previously noted, that it was error not to so instruct the jury. But other evidence in the case, hereinafter related, overwhelmingly establishes that defendant was not without fault, that he himself invited the encounter, and that as a reasonable man he was not warranted in believing that he was in such imminent danger of great bodily injury as to justify the commission of homicide. Under those circumstances it was not prejudicial error to fail to instruct on the phase of the matter in question.

The basic law of self-defense is set forth in sections 197 and 198 of our Penal Code. So far as pertinent here section 197 provides that "Homicide is . . . justifiable when committed by any person in either of the following cases:
. . .

"3. When committed in the lawful defense of such person . . . , when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person . . . if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed. . . ."

Section 198 reads as follows: "A bare fear of the commission of any of the offenses mentioned in subdivisions two and three of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone."

The pertinent principles governing the right of self-defense are explained in *People* v. *Westlake* (1882), 62 Cal. 303, 307: "The apprehension of danger to life or limb which justifies a man for taking the life of another must be an honest one—one that is well-grounded, and must arise out of a reasonable cause; but a cause which originates in the fault of the person himself—in a quarrel which he has provoked, or in a danger which he has voluntarily brought

upon himself, by his own misconduct, can not be considered
reasonable or sufficient in law to support a well-grounded
apprehension of imminent danger to his person . . .
Hence a real or apparent necessity brought about by the
design, contrivance, or fault of the defendant, can not be
availed of as a defense for the commission of a crime . . .
Yet it is not to be doubted that a person accused of crime
may show, in justification, that although he brought upon
himself an imminent danger, he, in the presence of that
necessity, changed his mind and conduct, and honestly en-
deavored to escape from it, but could not without striking
the mortal blow . . . And, in the absence of such cir-
cumstances, it must be true, as a legal proposition that
where a defendant seeks and brings upon himself a diffi-
culty with the deceased, in which he willingly continues
until he involves himself in the necessity to kill, the law
will not hold him guiltless. The right of self-defense, which
justifies a homicide, does not include the right of attack.''

█ In other words, when a defendant seeks or induces
the quarrel which leads to the necessity for killing his ad-
versary, the right to stand his ground is not immediately
available to him, but, instead, he must first decline to carry
on the affray and must honestly endeavor to escape from it.
Only when he has done so will the law justify him in there-
after standing his ground and killing his antagonist. (*Peo-
ple* v. *Soules* (1940), 41 Cal.App.2d 298, 314 [106 P.2d 639].)
The rule is expressed in 1 Wharton's Criminal Law 828-
832, sections 614 and 615, in the following manner: ''If
the defendant in any way challenged the fight, and went to
it armed, he cannot afterward maintain that in taking his
assailant's life he acted in self-defense. 'A man has not
. . . the right to provoke a quarrel and take advantage
of it, and then justify the homicide.' Self-defense may be
resorted to in order to repel force, but not to inflict ven-
geance. . . . 'There is certainly no law to justify the
proposition that a man may be the assailant and bring on an
attack, and then claim exemption from the consequence of
killing his adversary on the ground of self-defense. . . .'
But though the defendant may have thus provoked the
conflict, yet if he withdraws from it in good faith, and
clearly announces his desire for peace, then if he be pur-
sued his rights of self-defense revive. Of course, there must
be a real and bona fide surrender and withdrawal on his

part; for if there be not, then he will still continue to be regarded as the aggressor. . . ." (See, also, 13 Cal.Jur. 633, § 40.)

 The overwhelming weight of the evidence, including defendant's own testimony and extrajudicial statements, establishes that defendant was not an innocent person suddenly confronted with imminent danger of great bodily harm. On the contrary, the evidence shows that he was the "first wrongdoer" in that by his quarrelsome and challenging attitude, not only toward deceased but others in touch with him a short time prior to the homicide, he had created an atmosphere of antagonism that might naturally lead to physical combat if he continued, as he did, in his quarrelsome pursuit of trouble. Defendant, therefore, was not without substantial fault, a condition essential under the authorities to permit an accused to stand his ground and slay his adversary without first having sought to retire from the combat. Under all the circumstances, it cannot be said that the trial court erred to defendant's prejudice by failing to give an instruction on the right to stand one's ground and slay an adversary.

Defendant's second contention—that the evidence is insufficient to sustain a verdict of murder in the first degree and at most establishes murder in the second degree—requires a critical examination of substantially all the evidence in the record. The following narration of such evidence also furnishes the basis for the previously announced conclusion that it overwhelmingly establishes that defendant was not without fault and that he himself invited the encounter with decedent. The defendant's own account of the shooting is included, not as material to our consideration of the degree of the offense, but solely in reference to the showing that the failure to give the above discussed instruction was not prejudicial error.

The killing occurred on Monday, April 19, 1943, at Hall's Flat, a small station of the Western Pacific Railroad at its junction, in Lassen County, with the private line of the Red River Lumber Company. The defendant Holt was a rail-road telegraph operator; he possessed a .22 calibre bolt action repeater rifle, a 12 gauge shotgun, and two or more dogs. It was his custom to take walks, hunting small game, carrying a gun, and accompanied by his dogs. Romie L.

Riley, the deceased, was a brakeman on a logger train. The principal prosecution witnesses were also railroad employees. The defendant and his crippled wife lived in a cabin near the station. The evidence establishes that defendant was an affable and industrious man when sober, but quarrelsome and irresponsible when he had been drinking; aside from this change of disposition he manifested few, if any, signs of intoxication.

On Sunday morning, April 18, 1943, the defendant engaged in the first of a series of unprovoked disputes with other employees. He apparently had been drinking heavily. (The facts as to his *drinking* are established by both prosecution and defense witnesses but the state of the evidence in this regard, as hereinafter shown, is not such as to require a finding that, at the time of the homicide, he was so under the influence of intoxicating liquor as to have been incapable of forming the malicious intent essential as an element of murder. Hence the fact of his drinking is narrated as being pertinent to his quarrelsome mood but in reaching our conclusion as to the degree of the offense proved we assume, in conformity with the jury's verdict, that the defendant was fully capable, mentally, of the intent essential to the crime of which he stands convicted.) He instructed a fellow telegrapher to stay out of the telegraph office during his (Holt's) shift. Until shortly before his arrest on Monday afternoon, when (after, but not before, the homicide) he had reached a stage of stupefaction, the defendant continued to drink from time to time, substantially depleting the supply of whiskey which he kept in his cabin. On Sunday evening he had left his job ''unprotected''; i. e., had absented himself without procuring anyone to take his place. It was customary among the operators to ''watch out for'' one another in such a situation, but because of the earlier dispute no one substituted for the defendant on this occasion. Sunday night he was notified that he would have to stand an investigation of his absence from the job or resign. Monday morning he was in and out of the station several times with a ''chip on his shoulder for anybody that would argue with him.'' He was, on this day, morose and quarrelsome toward and concerning everyone he encountered.

Prosecution witness Hilton, a train engineer, testified he was in the station at Hall's Flat on the morning of April 19, when defendant came in and refused to accept a tele-

gram from telegrapher Shields. Defendant threw the message on the floor and left the door open as he departed. The witness closed the door and defendant returned, demanding to know who closed the door and stating, "Well, I am running things around here and I want you to understand none of you trainmen are going to have anything to do with it."

The engineer of the train on which deceased was brakeman testified that at approximately 10:30 o'clock on the morning of the shooting defendant walked from the station to the train with a message blank in his hand and the witness, thinking it contained instructions for him, stopped the train, got out on the ground, and asked defendant "what he had for us." Defendant asked, "What is the matter with Riley [deceased], is he trying to get tough around here?" The witness replied there was "nothing the matter with Riley, for him to leave Riley alone, and Riley wouldn't bother him," whereupon defendant said "he was going to go home and get his gun, and shoot his [Riley's] God damn heart out and wipe it across his mouth." The witness said the train then left the station, with Riley aboard, and returned about one hour and twenty minutes later; he did not consider the threat to be seriously meant although, he said, the defendant "did sound serious" and he communicated it to Riley. It was after return from the mentioned trip that the shooting occurred.

The quoted remarks, coupled with the subsequent acts of defendant in actually getting his gun—a .22 calibre rifle—and shooting decedent, may seem by themselves, at first impression, to establish a willful, deliberate, and premeditated intent to commit murder. Viewing that evidence superficially, it would appear possible to so hold and so dispose of this appeal. But in determining whether the life of the defendant legally is forfeit in expiation of his crime the jury was not free to isolate such specifically mentioned items of evidence from all the other related facts and circumstances. Particularly, the jury was bound to give consideration to certain material facts, hereinafter detailed. If such other facts merely create a substantial conflict in the evidence the determination by the jury is controlling but if those facts are indisputably established and if they are such as legally disprove, or overcome the efficacy of the basis for, the inference of existence of the essential intent, then it be-

comes our duty to hold that such intent has not been proved.

■ Implicit in our duty to determine the legal sufficiency of evidence to sustain a verdict is our obligation, in a proper case, to appraise the sufficiency and effect of admitted or otherwise indubitably established facts as precluding or overcoming, as a matter of law, inconsistent inferences sought to be derived from weak and inconclusive sources. Not every surface conflict of evidence remains substantial in the light of other facts. For example, we may assume a prosecution for robbery. The complaining witness establishes the corpus delicti and testifies that in his belief and from his observation the defendant is the person who committed the crime. This evidence standing alone would support a verdict of guilty. But if in addition it was *indisputably* proven by prosecution witnesses that at the time of the offense the complaining witness was totally blind and that the defendant was in the military service on duty in a foreign land, we should be bound, notwithstanding the legal sufficiency of the isolated statements, to view the related facts and circumstances (irrefragably proven) and hold that such evidence in the light of all the established circumstances was insufficient, as a matter of law, to sustain a verdict of guilty.

■ Here the verdict of guilty of murder of the first degree depends upon proof not only of a malicious intent unlawfully to take life but also that such malicious intent was *willful, deliberate, and premeditated,* and that the homicide was of equal cruelty and aggravation with those enumerated in the statute (Pen. Code, § 189, hereinafter quoted.) As hereinafter discussed more fully, the phrase ''malicious intent'' is not synonymous with ''willful, deliberate, and premeditated'' intent. The proof of malicious intent without the further proof that it was ''willful, deliberate, and premeditated'' would establish second degree murder but not first degree murder. And since that proof depends at best upon the not infallible processes of reasoning, and is to be derived only by way of inferences from the acts of the defendant and the surrounding circumstances, fairness demands of us, as it did of the jury, that the statements of the defendant and his acts be appraised in the fullest legally available light of all the related facts and circumstances.

■ The function of the jury was to appraise the weight of the evidence; ours is to appraise its legal adequacy; and in the performance of these functions the jury could not

lawfully, nor may we, disregard certain material facts which are indisputably established by prosecution witnesses.

As previously indicated the decedent was not the only person toward and concerning whom the defendant manifested his disturbed mood. The witness Walter F. Damaske, a brakeman, testified to a conversation with the defendant which occurred a few minutes before the shooting. The defendant was walking along the track with his rifle and his dogs. Damaske met him and the following conversation took place: "I said, 'Hello, Mr. Holt.' He said, 'Some of these old sons-of-bitches around here had better mind their own damned business.' And I said, 'What do you mean, and who do you mean?' And he said, 'Shields and Cleveland.' [Shields and Cleveland were fellow telegraphers.] And I said, 'Are they giving you trouble? Are you in a jam? Did you get fired, or did you blow up?' And he said, 'Blow up, what do you mean, blow up?' I said, 'Oh, nothing, but if I wanted to stay on the job, I would stay on it. I wouldn't let anyone run me off.' That ended the conversation."

The witness Ferguson, conductor of the train of which Riley and Damaske were brakemen, testified that defendant told him that he did not like the Western Pacific Railroad or its employees and "didn't want anything to do with any of them." He said, "I am all through with the Western Pacific and the Red River Lumber Company, and anybody that works for them." The witness continued, "Well, I said, 'Say, I hope you don't mean me on that.' He said, 'Yes, you are working for them.'" About an hour later Ferguson again encountered defendant and concerning that meeting testified, "just as I was going, I didn't stop, he tried to tell me to go over by a big tree and pull it up and get in the hole."

The only evidence of any prior ill feeling between the defendant and Riley concerns the defendant's vexation over Riley's taking of coal which the railroad company furnished for the telegraphers' use and Riley's annoyance because the defendant once refused to entrust him with train orders when Riley assertedly had been drinking. The defendant denied having had any feeling of enmity toward the deceased or any intention to do him harm, and apparently no rational ground existed for the defendant to have ill feeling either toward Riley or any other of the several persons mentioned above.

Concerning the coal-taking incident the prosecution witness Shields testified that at some prior time "there was a little dispute over some coal . . . It didn't amount to much . . . Mr. Riley was getting coal [out of the telegraphers' bin] for his caboose, and when the coal got a little low, we ordered more, and the second supply wasn't so good. . . . [The coal was kept there for the] telegraphers' use; however, when the loggers run short I permitted them to take coal. . . . [The coal belonged to the Western Pacific Railroad.] He [Holt] seemed to think it [the new supply] wasn't good for any purpose, heating or cooking. . . . He said if Riley had left the coal alone we would have had sufficient coal to run us over the winter. . . . He didn't say that angrily." Specifically as to Holt's attitude on the matter the following questions were asked and answers given:

"Q. Was there anything in the statements that would indicate that Holt was in any wise peeved or perturbed over the fact that the coal had been taken? A. Yes, like he was a little peeved at Riley for taking the coal.

"Q. He didn't indicate by his actions or by anything that he said that he was inclined to do any harm to anybody for having taken the coal? A. No, he never."

The testimony of the witness also established that the new supply of coal was in truth of a definitely inferior grade. Just how long it was before the shooting that the coal incident occurred is not shown but it does appear that at that time Riley was employed as conductor of the logging train, whereas at the time of the shooting he was serving as a brakeman.

About 11:30 a. m. on Monday, April 19, the defendant went for his customary walk with his dogs and his gun. As he passed the station he remembered that there was a blanket there which he wished to pick up. He went in to get it and, as he testified, "I didn't intend getting but one. They say I had two." He stopped in the telegraph office and sent a message. He then walked toward his cabin along a road parallel to the railroad track. At a switch stand about 120 feet from the station he came upon Riley and the unfortunate tragedy occurred. The only eyewitness to it (other than defendant) was George M. Keever, locomotive fireman. His testimony is the most crucial in the case and hence is quoted in part. The questions and answers are as follows:

"Q. Where was Mr. Holt standing? A. Mr. Holt was standing, I should say, in this wheel track; no question about that, he was in that wheel track.

"Q. By 'wheel-track,' you mean this smooth part on the dirt road? A. Yes, and close by the switch-stand here, a few feet more or less to one side, but in the close vicinity of that switch-stand.

"Q. And definitely, you say, in the wheel-track? A. Oh, yes, no question about that.

"Q. What did Mr. Holt have with him at that time? A. Mr. Holt had what it looked to be two good-quality wool blankets under his left arm.

"Q. Did he have anything else in his hand? A. Yes, he had a 22 rifle in the other hand.

"Q. You stated you had some conversation there, just what was the conversation? A. I said, 'Hello, Jack.' That was what we called Mr. Holt. I says, 'Hello, Jack.' I says, 'How is everything going?' He said, 'O.K., but right now I am telling this brakeman off.' . . .

"Q. Where was Mr. Riley at that time? A. Mr. Riley was standing on the opposite side of the track, on the end of the ties.

"Q. That would be on the side of the track away from Mr. Holt? A. Yes.

"Q. And where was he in relation to the end of the train? A. He was leaning against the rear car with his elbows in a relaxed position, as one would lean on something of that nature.

"Q. And after Mr. Holt said to you, 'O.K., but right now I am telling this brakeman off,' what happened then? A. I started walking on in the direction of Hall's Flat station south, and just before I got out of hearing distance I heard Mr. Riley tell him to take his gun and his dogs and go on about his business, that he didn't have time to be bothered with him. *And by that time I was out of hearing distance,* and neither of them right at that particular moment had their voice raised, and their conversation was of no interest to me; so I didn't pay any particular attention to it. I just went on about my business.

"Q. Did you then proceed down the dirt road in the general direction of Hall's Flat station? A. Yes.

"Q. What was the next thing that happened? A. I heard the rifle crack.

"Q. About how far had you proceeded along that road before you heard the rifle? A. Oh, something like 50 or 60 feet.

"Q. You heard the rifle, report of the rifle? A. Yes.

"Q. What did you do at that time? A. I turned quickly to see what Mr. Holt was firing at.

"Q. And what did you see at that time? A. I seen Mr. Holt standing with both hands on the gun, the blankets laying on the ground, *and Mr. Riley was going in his direction across the track, and just about in the act of stepping down off the end of the tie, or had stepped down off the end of the tie, in the direction of Mr. Holt; and Mr. Holt raised the gun up again to a firing position, and says, 'Stay back, don't come any closer, or I will kill you,' and fired again.*

"Q. *Where was Mr. Riley with relation to the switch-stand at that time?* A. *He was close enough to say that he was right at it.*

"Q. In other words, when you saw him with his arms on the car, he was on the west side of the track? A. Yes.

"Q. And between the first and second shot you saw him come from behind the end of the car? A. Yes, I did.

"Q. And across towards the switch-stand, is that it? A. Yes.

"Q. And is that when Mr. Holt made the remark that you stated? A. Yes.

"Q. And what was it that Holt said again at that time? A. Do you want me to repeat it?

"Q. Yes. A. He says, 'Stay back, don't come any closer, or God damn you, I will kill you,' and punctuated his command with the firing of the gun.

"Q. At that time, if I understand you correctly, Mr. Riley was at the edge of the ties? A. Yes, he had not gone beyond the switch-stand. The switch-stand was still between he and Mr. Holt. He had not passed it.

"Q. That would be the east side of the track? A. Yes.

"Q. Were you looking directly at Mr. Holt when he fired? A. I was looking directly at him. There was absolutely nothing between he and I, whatsoever.

"Q. From what position, Mr. Keever, did he fire the rifle? From the shoulder, from the hip, or how? A. From the shoulder.

"Q. Did you see him raise the gun to his shoulder? A. I did.

"Q. And in which direction were you looking when the gun went off the second time? A. I was looking in a northerly direction, and straight at Mr. Holt and Mr. Riley. The whole scene was being acted out right there before my eyes.

"Q. What, if anything, did Mr. Riley have in his hand at that time? A. Nothing, other than his gloves. He had his gloves on.

"Q. When the second shot was fired, what happened? A. Right on the report of the gun, Mr. Riley said, 'Uh,' like that, and grabbed himself across the stomach,—

"MR. ANDERSON: He indicates with his hands across his stomach.

"THE WITNESS: (Continuing) A. As though one would hold a place where they were injured, or where a severe pain was.

"Q. You indicate that by folding your arms across the front of his chest, so to speak? A. He said 'Uh,' like that.

"Q. A little lower than his chest? A. Just about the lower ribs. And he was facing me, more or less, in the act of turning, and he continued the turn—about faced completely, and went back the way he had came, and around the car and down the opposite side of the train toward the station, still holding himself across the stomach.

"Q. Did you say that he had started to turn at the time the shot was fired? A. Yes, he was in the act of turning.

"Q. In the act of turning? A. Yes, and he was turning in my direction.

"Q. What did you do then? A. I climbed through the train, between the other logging cars, over the draw-bar, and dropped down on the other side, and seen that *Mr. Riley was still on his feet and coming toward the station,* and apparently I could be of no assistance to him, and I went on to the station just ahead of Mr. Riley and went inside. . . ..

"Q. What was the last you saw of Mr. Holt at that time? A. It was immediately following the firing of the second shot. He turned as Mr. Riley turned, and went around the train. *Mr. Holt turned and went north towards his cabin. He had dropped the blankets in the road—throwed them down—and he completely disregarded them. Left them laying in the road.*

"Q. How about the gun? A. *He still had it in his hands when I saw him last.* . . .

"Q. Now, what did you say was Mr. Holt's condition as to intoxication, or sobriety? A. Well, the best I can give you is my opinion.

"Q. Certainly? A. *I should say that he was intoxicated.*

"Q. Just slightly, or highly? A. *Highly,* and that is based strictly on his actions and his conduct. I didn't see him take a drink.

"Q. And when he was asking you into his cabin, did he mention anything about coming in and having a drink? A. Yes, he did. He invited me into his house to have a drink.

"Q. And this opinion as to his intoxication was gained from the first meeting with him, when you walked up the road with him to his cabin? A. Yes.

"Q. That is correct, is it? And how did his condition appear to compare with when you saw him the second time immediately before the shooting, with what it was early in the morning? A. Well, it was—— It was hard to judge or observe, and say definitely as to his condition, but as regards the shortness of time—— the interval of time when I walked up the track with him early in the morning, and at the time I seen him the last time, there couldn't have been a great deal of change in him.

"Q. There was a short interval of time, and a high state of intoxication, and you didn't figure he had had time to sober up very much, is that correct? A. Yes, there was only about two and a half hours to three-quarters hours difference, and if he had had no more to drink, there wouldn't have been a reasonable time to sober up in, we will say." (Italics added.)

According to the testimony of the wife of defendant, which is not disputed, he returned to his cabin, set the rifle in its usual place, sat down on a cot, "picked up a bottle and took a real big drink and lay back and went to sleep . . . almost before his head was down, he was out." This, apparently, was shortly after 11:30 in the morning. He roused once, took another drink, and remained apparently stupefied until the sheriff came and arrested him at about 2:15 or 2:30 p. m.

The sheriff found the rifle in the cabin, apparently in its customary location. He described it as "a bolt action repeater, tubular type of magazine" of .22 calibre, "adapted to the 22 short, long, and long rifle cartridges." He said

that he found *"one loaded cartridge in the barrel and seven in the magazine."* The defendant was still on the cot. Concerning his condition at that time, the sheriff's testimony is as follows:

"Q. What was his condition at that time? A. Well, he didn't respond. Mrs. Holt answered the door, and I immediately asked if Mr. Holt was there, and she responded, 'Yes.' I immediately saw Jack, and I went right on directly in over to where Mr. Holt was. The gun was standing just to the right, possibly six feet, and I stepped between. Mr. Holt and the gun, and spoke to him, and he didn't respond.

"Q. Could you tell whether he was asleep, or passed out, or drunk at that time? A. At that time I couldn't tell whether he was asleep. He had his arm up over his head. Whether he was watching me, or what, I wasn't certain.

"Q. *How long did it take you to get him aroused?* A. *I went over and took hold of his arm and I got him on his feet, and I had spoken to him two or three times, and about the—— possibly the third time I spoke, he spoke a sentence or two, or talked to Mrs. Holt, rather.*

"Q. Was he dressed or undressed at the time? A. Fully dressed.

"Q. Fully dressed. Was he covered up, or lying on top? A. On top of the covers, to the best of my recollection. . . .

"Q. Now, after you had got Mr. Holt away, after you had gone into his cabin and had a little trouble arousing him, what would you say as to his condition as being drunk or sober? A. When I first—— You just want an opinion?

"Q. That is all you can give. A. I would say that he was moderately intoxicated. That would be my opinion.

"Q. That was at the time you arrived there, along in the neighborhood of 2:30? A. Yes.

"Q. Did you make any investigation to see whether he had any supply of liquor in the house at that time? A. I did.

"Q. What did you find? A. I found a quart bottle of whiskey, I would say, possibly half or a third of a bottle of liquor left in the bottle. I would say half of it, or a little over a pint of liquor left in the bottle.

"Q. That was a quart bottle? A. Yes.

"Q. Was that a plain bottle, or was it some kind of bonded goods? A. It was bonded goods." (Italics added.)

Apparently before the defendant had fully recovered from his intoxication and before Riley had died, the sheriff asked some questions and in reply the defendant said, according to the sheriff's testimony, ''I shot him, because he called me dirty names . . . He had it coming . . . Sheriff, I would shoot you if you called me dirty names . . . I didn't want to kill him. I didn't want to kill anybody. I wouldn't shoot anybody in the back. That would not be sportsmanlike.''

Defendant took the stand in his own defense and testified that he had voluntarily imbibed intoxicants both before and after the homicide, which, he asserted, caused his memory to be hazy, if not a blank, as to some of the events. Defendant did recollect and admit, however, that he had ordered a fellow telegrapher to stay out of the station during his (defendant's) shift. He also admitted having refused to accept the telegram from the telegrapher on the morning of the homicide and also recollected going back to inquire who had closed the station door after he had departed leaving it open. After relating a story which tended to establish that cordial relations existed between him and deceased —the described relationship being such that on several occasions he had treated deceased to a drink—defendant testified that on the morning of the homicide deceased, after assertedly saying he was glad defendant lost his job, and without apparent provocation, advanced toward him with a brake stick or club. At no time, however, according to defendant's own testimony, was deceased close enough to strike defendant with the stick. Defendant admitted firing two shots. He claimed that the *first* was preceded by a verbal warning to Riley to stay back and that *both* were aimed at the ground. The course of the bullet through Riley's body, however, seems to establish that the second shot was aimed directly at him. The testimony of the prosecution witness Keever, previously quoted, establishes that the warning ''stay back, don't come any closer,'' was given, but he places such warning as immediately preceding the *second* shot. The testimonies of both Keever and defendant unite in showing that *both* shots were fired without defendant's having made any attempt to back up or to otherwise avoid the shooting.

The defendant's own account of the shooting and the events immediately preceding it is as follows:

"Q. Where was Mr. Riley when he first spoke to you? A. Well, he was on the other side. May I show the jury where Mr. Riley was? (Goes to map and indicates on map.) He was on this side of the track.

"Q. That would be on the west side of the track? A. On the west side of the track, yes, sir. Now, it wouldn't be, either—— the east side. Yes, the west side of the track.

"Q. That was where you first saw him? A. Yes, sir, when I first saw him.

"Q. Was that where he was, you say, when he spoke to you and you couldn't understand him? A. Yes.

"Q. What did you do after he spoke to you? A. Well, I asked him what he said, and then he said, 'You don't like me, do you?' I said, 'I don't see how you figure that.' And instead of commenting further, he said, 'You lost your damn job, didn't you?' I said, 'Well, maybe so, but,' I says, 'what difference does that make as far as you are concerned?' He said, 'Well, I am glad you lost your job.' I said, 'I don't know why you feel like that. You are wrong, Riley, I helped save your job.'

"Q. What did he say? A. He said, 'You S--t.' And I said, 'That is exactly what happened. I helped save your job.' That was the answer I gave to him.

"Q. Did he say anything else to you, or make any demonstration or any threat? A. No, he didn't say nothing. He didn't say anything, but the expression on his face,—you could see he was awfully peeved, just right immediately afterwards.

"Q. What did he do then? A. He started towards me.

"Q. Did you see anything when he started toward you? A. Yes, as he got near the rail, that is the furtherest rail from me, he reached down and picked up something.

"Q. What did he pick up? A. Picked up a club.

"Q. What kind of a club was it? A. I would say it was a hickory stick about that long—I didn't mark it or pay any attention to it. It looked like a hickory stick, something like that.

"Q. What did he say to you at that time? A. He said, 'Well, I will beat hell out of you, and that damned crippled wife of yours, too.' He kept coming, and I told him to stay back.

"Q. Do you know what that is (Exhibiting stick to witness)? A. Yes, sir.

"Q. What is it? A. It is just a hickory stick that some of the boys picked up some place, maybe. They buy them and use them for brake sticks on the cars.

"Q. What is a brake stick? A. It is a stick of hard material and they run it into the brake-wheel and they set up the brake on the car to tighten up this wheel. And they give it a good pull around that way to set the brake tighter with it.

"Q. Is that the way the brakes are operated manually? A. Nothing manual about them. It is the brake setup on the car, and if empty cars are switched into a siding there might be a little bit of grade there, and then they have to set up those brakes, in order to keep the cars from going down-grade. That is what you call a brake-stick.

"Q. Was it something similar to that that Riley picked up at that time? A. Yes.

"Q. What did he do then? Did he come toward you? A. Yes, he did.

"Q. What, if anything, did he say, other than what you have just said? A. That was all he said.

"Q. What did you say to him? A. I told him to stand back.

"Q. What did you do then? A. And when he come further, why, I shot with this 22 rifle.

"Q. And in what direction did you shoot? A. Well, I was shooting toward the ground. I was holding the rifle this way and shooting toward the ground and I am pretty sure I was shooting to the left of him at that time.

"Q. What had become of the roll of blankets? A. I guess I dropped them. I don't know.

"Q. You don't know. After you had shot the first time, what did Riley do? A. He kept coming.

"Q. Did he say anything further to you? A. No, he didn't.

"Q. What did you say to him? A. I just told him that one time to stop.

"Q. What did you think he was intending to do when he came toward you? A. He wasn't going to play with me, not with that stick in his hand.

"Q. You know that he had a club similar to this in his hand at the time? A. Yes, sir.

"Q. Just what was his position? Where was he when you fired the first shot? A. Well, he was—— he had stepped

over that first rail, and was still coming. He was getting pretty close to the second rail, I would say.

"Q. Do you know what position he was in when you fired the second shot? A. Still coming towards me, straight towards me.

"Q. You didn't say anything further to him? A. No, sir.

"Q. What position did you have the gun in when you fired the second shot? A. I was holding it like this.

"Q. Did you have it up to your shoulder? A. No, sir, I certainly did not.

"Q. After the second shot was fired, what, if anything, was said by either you or Riley? A. After the second shot was fired Riley grabbed himself in the stomach, something like this, and then the expression changed on his face and he said, 'You shot me.'

"Q. What, if anything, did you say? A. I said, 'Riley, if I did, I am sorry.'

"Q. Had you deliberately pointed the gun at him with the intention of shooting him? A. No, sir."

(It is to be noted, in connection with the defendant's claim of error in the trial court's failing to instruct the jury relative to his asserted right to stand his ground and shoot in self-defense, that the defendant's above-quoted testimony, taken literally, tends to establish involuntary homicide rather than intentional killing in self-defense.)

Defendant's wife testified that after the shooting she was walking in the general vicinity of the switch stand and picked up a "stick" which she used as a cane. The "stick" was introduced in evidence though defendant was unable to identify it as the "club" assertedly held by deceased. The wife stated that when defendant came into the cabin immediately after the shooting he did not mention that deceased had a stick or club in his hands. Defendant and his wife were the only witnesses called by the defense.

The prosecution called the following several witnesses in rebuttal: The sheriff testified he had searched the vicinity of the shooting (which was prior to the time defendant's wife said she found the stick) and that he did not see there a stick or club resembling the one placed in evidence. Damaske, the brakeman, testified that at no time during the switching operation which immediately preceded the shoot-

ing did he see a stick or club in deceased's hands and that he did not notice a stick on the ground resembling the one in evidence. One of the other trainmen also testified that at no time did he see a stick or club in deceased's hands. The witness Keever testified that between the first and second shots he had a full view of deceased and he did not have a stick or club in his hands. This witness said, "I am telling you I seen both hands and if that stick, or any other stick like it, had been in his hands I would have seen it. . . . No, sir, it wouldn't have been possible for him to have that stick in his hands and I not seen it." As to the weight of such testimony, however, it is but fair to the defendant to note that the witness on his preceding cross-examination had testified as follows:

"Q. Now, you didn't, after you passed the switch, you didn't turn and look back until you heard the shot fired, did you? A. That is right.

"Q. So if, in the meantime, between that and the other shot that was fired immediately before, whether he had something in his hands besides his gloves, you wouldn't have known it, would you? A. He could have had something in his hands without my seeing it, after he passed beyond my range of vision and going on in that direction towards the station."

The superior court reporter, who had reported a statement made by defendant to the district attorney and others on the evening of the day of the shooting, testified that defendant, when asked if he was intoxicated at the time of the shooting, replied, "No, hell, no"; and that when asked if deceased had anything in his hands, he responded, "I don't know whether he had a brake club or not; but I know when he said so-and-so, and started towards me, I guess that is when I blowed my top. . . . He said some bad words that wasn't nice for him to say."

■ Some of the evidence above quoted may seem to establish that the defendant, at the time of the homicide, was so deeply under the influence of intoxicating liquor as to have been incapable of forming in his mind that "malice aforethought" which is an essential element of the crime of murder of either degree. Of course, if he had been so intoxicated as to be wholly incapable of a malicious intent we should be confronted with a problem as to whether any offense higher than manslaughter was established. (*Cf. Peo-*

ple v. *Kelley* (1929), 208 Cal. 387 [281 P. 609], wherein a
judgment for murder of the first degree was reduced to one
for manslaughter.) But, as previously stated, we do not
regard the evidence as requiring a finding that he was so
intoxicated. Support for this conclusion appears in the tes-
timonies of several witnesses who stated their opinions as
to defendant's condition as follows: Dorithy, "didn't think
he was drunk"; Ferguson, "didn't seem as though he was
under the influence of liquor"; Keever, "no indication as
regards his intoxication"; Hilton, "able to walk around
and talk coherently"; Damaske, "walked and everything
else, just like he always did." We therefore regard the
implied finding of the jury that the defendant was capable
of forming a malicious intent as being conclusive of that
fact. Hence, the crucial question on this phase of the ap-
peal is whether all the above narrated evidence is sufficient,
upon any fair interpretation of it, resolving all reasonable
inferences in favor of the judgment, to establish that the
homicide was murder of the first degree *as distinguished
from murder of the second degree.* To differentiate the two
degrees intelligently it is essential that we have a defini-
tive understanding of each.

Murder, and this, of course, includes murder of the *second*
degree as well as murder of the first degree, is defined as
"the unlawful killing of a human being, with malice afore-
thought." (Pen. Code, § 187.) The cognizable and prac-
tical differences between murder of the first degree and that
of the second degree are difficult to delineate because in all
the legal history of California that of the second degree
appears never to have been the subject of an authoritative
definition that is fully conceptual and substantive.

The legislative definition of the degrees of murder leaves
much to the discretion of the jury in many cases. That dis-
cretion, however, must have a sound factual basis for its
exercise, as hereinafter is more particularly discussed. The
Penal Code (section 189) declares that "All murder which is
perpetrated by means of poison, or lying in wait, torture, or
by any other kind of willful, deliberate, and premeditated
killing, or which is committed in the perpetration or at-
tempt to perpetrate arson, rape, robbery, burglary, or may-
hem, is murder of the first degree; and all other kinds of
murders are of the second degree." It is noteworthy that

murder perpetrated by gunshot is not, as such, classed as murder of the first degree. It has been held that the existence of a deliberate purpose to kill may be inferred from the character of the weapon used, the circumstances surrounding and showing the relationship of the parties, and the acts and conduct of the accused. (*People* v. *Cook* (1940), 15 Cal.2d 507, 514 [102 P.2d 752]; *People* v. *Smith* (1940), 15 Cal.2d 640, 647 [104 P.2d 510]; 13 Cal.Jur. 597, § 14.) And it has been held that the act of killing may follow the intent to kill as quickly as follow successive thoughts of the mind. (*People* v. *Garcia* (1935), 2 Cal.2d 673, 683 [42 P.2d 1013]; *People* v. *Aranda* (1938), 12 Cal.2d 307, 310 [83 P.2d 928]; *People* v. *French* (1939), 12 Cal.2d 720, 745 [87 P.2d 1014].)

Obviously the homicide in this case was not perpetrated by means of poison, or lying in wait, or torture, nor was it committed in the perpetration of or attempt to perpetrate any of the enumerated felonies. Hence, if it is first degree murder it must come within the classification of "any other kind of willful, deliberate, and premeditated killing." But homicide to amount to even second degree murder must be "the unlawful killing of a human being, with malice aforethought." The malice which is one of the two essential elements of the offense—whether of the first or of the second degree—is defined by section 188 of the Penal Code. "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

Writing on the subject "*What is Second Degree Murder in California?*" Mr. James A. Pike in Southern California Law Review (1936, vol. IX, p. 112) declares: "Felonious homicide involves such grave implications that, from the standpoint of society, the law relating thereto is doubtless the most important branch of criminal jurisprudence. Due, on the one hand, to the great interest society has in protecting itself from such acts, and, on the other, to the gravity of the penal sanctions threatening the accused, this field should be one of the greatest clarity. But, unfortunately, this is not the case. In fact, there probably is no field of the law in which there is greater obfuscation, no field in

which the courts are more guilty of saying one thing, meaning another—and doing a third!

"The chief difficulty seems to lie in ascertaining the exact lines of division between the various types of homicide recognized as felonious. Due perhaps to the long recognition that the distinction has had at common law, the meanings of murder and manslaughter are relatively clear, although the terms themselves can not clearly be defined. A common statement of the distinction is that 'malice aforethought, either express or implied, is presumed to be wanting in manslaughter.' (1 Mitchie, Homicide (1914), 130, § 21.) Although 'malice aforethought' is a rather confusing term in defining murder—and, *a fortiori,* is confusing where it is sought to distinguish the degrees of murder, nevertheless it appears to be more convenient than any other term in the legal vocabulary as an expression of the distinction between murder and manslaughter. *Intention* will not do: 'voluntary manslaughter'—killing in the heat of passion upon sufficient provocation—is intentional but, nonetheless, manslaughter. Of course, from a strictly realistic point of view, such a killing is likewise *malicious;* but, according to common law tradition, the malice is presumed to be wanting in such a situation, the act 'being rather imputed to the infirmity of human nature.' (1 Mitchie, Homicide (1914), 130, § 21.)

"It can readily be seen that the chief difficulty in distinguishing murder from manslaughter is a question of suitable and accurate terminology. However, the task of drawing with precision the exact line dividing first and second degree murder is fraught with difficulties of a more fundamental nature. It brings one face to face with the question of what the courts really mean by the terms familiar in the jargon of homicide, such as 'deliberation,' 'malice' and 'intent'; and, further, what fact-situations actually exist in cases where convictions for second degree murder are sustained. . . .

"[P. 120] In the first California case involving the distinction between first and second degree murder (*People v. Bealoba* (1861), 17 Cal. 389), the trial court had instructed the jury that 'intent to kill' was the criterion. The trial judge had said:

" 'The first inquiry, therefore, of a California jury, after

a felonious and malicious homicide is established, and not committed by means of poison or lying in wait, is to determine whether the mortal shot was fired with intent to take life; or merely to do bodily harm; if with intent to take life, it is murder in the first degree; if merely to inflict bodily harm, it is only murder in the second degree.'

"The trial court seemed to wish to convey the idea that premeditation could be inferred from intent and, in support of this proposition, it cites this example:

" 'Let it be supposed that a man without uttering a word should strike another on the head with an ax, it must, on every principle by which we can judge of human actions, be deemed a premeditated act.'

"The supreme court affirmed the decision, thus sustaining the instruction. Mr. Justice Baldwin said, in support of the judgment:

" 'These terms, "deliberate—wilful—premeditated" are used in the English books, and were well known to the framers of our act; and they have the same meaning.'

"The effect of this decision, if it had been followed in this State, would have been to emasculate the distinction between the two degrees of murder. Leaving out of consideration for the moment killings in the perpetration of felonies, intent to kill or seriously injure is an element of the crime of murder. True, this intent need not be specific, but the intent must be present. But if, as the *Bealoba case* holds, deliberation is identical with intent, then what room is there for an 'intended murder without deliberation'? What mental state would constitute second degree murder? It was not necessary for the court to decide this issue in the *Bealoba case*, since in fact the defendant was convicted of first degree murder.

"However, four years later, the supreme court was faced with the necessity of deciding this very issue. The trial judge had instructed the jury that 'murder is divided by our law into two degrees—the first includes every unlawful killing of a human being done maliciously or intentionally.' This instruction corresponds closely to the analysis made by the supreme court in the *Bealoba case*. If ' "deliberate—wilful—premeditated" . . . have the same meaning,' and 'every intentional act is necessarily a wilful one,' then it is correct to say that first degree murder 'includes every unlawful killing of a human being done maliciously or intentionally.' Thus, on the authority of the *Bealoba case*,

the instruction should have been sustained. But it was not. When the court was brought face to face with the logical result of its own language it refused to recognize it. Hence the *Bealoba case* was overruled *sub silentio*. The court made it clear that intent and deliberation were *not* synonymous; that something more than intent was necessary to constitute first degree murder; that intent to kill is not enough but that 'the intent to kill must be the result of deliberate premeditation.' (*People* v. *Sanchez* (1864), 24 Cal. 17, 30.)

"This decision seems to have settled the California law on the question. Stated simply, the result of the decision is that in California (prescinding for the moment from killings in the commission of felonies) *intentional* and *deliberate* homicide is murder in the first degree; *intentional* homicide *without deliberation* is, in the absence of mitigating and exonerating circumstances, murder in the second degree. . . .

"[P. 134] Following the enumeration of specific means the use of which determines the degree of the crime, the statute adds 'or any other kind of wilful, deliberate, and premeditated killing.' This language clearly calls for the application of the familiar *ejusdem generis* rule of statutory construction: where more general words follow words of a specific and particular meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to things of the same general kind as those specifically mentioned. This rule of interpretation is applied with particular stringency where penal statutes are involved.

"Further, the use of 'wilful, deliberate, and premeditated' in conjunction would seem to indicate that the legislature meant, by reiteration, to emphasize its intent to require, as an element of first degree murder, considerably more reflection than the mere amount of thought necessary to form the intention."

The lack of clarity and consistency in concept commented upon by Mr. Pike also appears in cases in which the appellate courts have considered their power (Pen. Code, § 1181 (6)) to reduce the judgment to a lower degree or lesser offense. In *People* v. *Wells* (1938), 10 Cal.2d 610, 626 [76 P.2d 493], this court declared that "from a consideration of the cases to which reference has been had, it is apparent that in first degree murder cases the authority conferred by the provisions of the statute [Pen. Code, § 1181 (6)]

should be exercised only where the evidence either clearly is insufficient to show anything other than that the defendant therein unlawfully killed a 'human being [presumptively] with malice aforethought,' that is wilfully, deliberately and premeditatively,—or, possibly, that with respect to whether such a condition in the mind of the defendant existed, as was indirectly suggested in the latter case [*People* v. *Howard* (1930), 211 Cal. 322 (295 P. 333, 71 A.L.R. 1385)], when this court entertains 'a doubt as to its (the evidence) showing murder of the first degree'.''

Such quoted statement, although uncertain in meaning, appears to imply that killing with malice aforethought is synonymous with killing ''wilfully, deliberately and premeditatively.'' This view, it is obvious, substantially emasculates the difference between murder of the first degree and that of the second degree, and is not warranted by the statute.

Another phase of the lack of conceptual consistency is manifest in the varying bases upon which the reviewing courts have predicated exercise of the power to reduce judgments to a lower degree or lesser crime. Such reductions have been grounded on ''a doubt'' of the court as to the sufficiency of the evidence to establish the higher degree (*People* v. *Howard* (1930), *supra*, 211 Cal. 322, 330; *cf.* *People* v. *Wells* (1938), *supra*, 10 Cal.2d 610, 627); on the statement that ''there is nothing in the record from which it may with reason be argued'' that the ''disgusting, bestial and shocking injuries'' which caused death ''were inflicted with that intent or that malice aforethought which is a necessary ingredient of the crime of murder. Nor can we bring ourselves to believe that there was a wilful, deliberate and premeditated killing'' (*People* v. *Kelley* (1929), 208 Cal. 387, 389 [281 P. 609]); on the declared proposition that ''where evidence is open to two equally reasonable constructions, one of which points to the guilt of the defendant of a higher degree of a crime, and the other to his guilt only of a lesser degree thereof, the court must adopt that theory pointing to guilt of the lesser degree'' (*People* v. *Golembiewski* (1938), 25 Cal.App.2d 115, 118 [76 P.2d 717]); on the declaration that ''Taken as a whole, the evidence presented falls short of the modicum required for a conviction of murder of the first degree, in that it fails to show that the injuries which decedent suffered were inflicted by appellant 'with that intent or that malice aforethought which is a nec-

essary ingredient of the crime of murder' " (*People* v. *Castro* (1940), 37 Cal.App.2d 311, 315 [99 P.2d 374]); on the ground that the reviewing court "failed to find satisfactory evidence of premeditation in the killing" (*People* v. *Cowan* (1940), 38 Cal.App.2d 231, 248 [101 P.2d 125, 135]); on the statement that "The evidence . . . was hardly sufficient to support a verdict of murder of the first degree, when reviewed in the light of all the surrounding circumstances shown by the record, and taking into consideration the decisions of the Supreme Court in the cases of *People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385], and *People* v. *Kelley,* 208 Cal. 387 [281 P. 609]" (*People* v. *La Fleur* (1940), 42 Cal.App.2d 50, 57 [108 P.2d 99]); and on the conclusion that "After viewing the case in the light of all the surrounding circumstances . . . we are not satisfied that the evidence establishes any greater degree of crime than manslaughter" (*People* v. *Slater* (1943), 60 Cal.App. 2d 358, 371 [140 P.2d 846]). See, also, *People* v. *Daniel* (1944), 65 Cal.App.2d 622, 632 [151 P.2d 275].

▪ Regardless of imperfections of academic concept either in the statutory law as enacted or in some of the decisions interpreting it, we are faced with the task of making practical application of that law to actual facts. In such application certain principles are entitled to recognition. Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again dividing the offense of murder into two degrees is a further recognition of that infirmity and of difference in the quantum of personal turpitude of the offenders. The difference is basically in the offenders but is to be measured by the character of the particular homicide. The victim of manslaughter or second degree murder is just as dead as is the victim of first degree murder. The law has fixed standards by which such personal depravity of the offender; i.e., the character of the particular homicide, is to be measured. When the homicide is perpetrated by means of poison, or lying in wait, or torture, or in the perpetration of or attempt to perpetrate the enumerated felonies the standard is definite and no difficulty in fixing the degree ensues. ▪ But when it is claimed that the homicide is by "any other kind of willful, deliberate, and premeditated killing" there is necessity for an appraisal which involves something more than the ascertainment of objective

facts. This appraisal is primarily a jury function and within a wide field of discretion its determination is final. ▮ But as is true as to all factual issues resolved by a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict. To the extent that the character of a particular homicide is established by the facts in evidence the jury is bound, as are we, to apply the standards fixed by law. "The discretion of jurors in considering the effect of evidence as proof is not absolute. It is their duty to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion." (*People* v. *Elmore* (1914), 167 Cal. 205, 211 [138 P. 989].)

▮ As to the specific probative facts which must be proved in order to meet the standard of first degree murder under the classification of "any other kind of willful, deliberate, and premeditated killing" it is apparent, as previously indicated, that the statute contemplates—and probably wisely so—that the field of jury discretion shall be wide. But that there are limits to that field cannot be disputed. The statute does establish a reasonably definite conceptual standard and the very fact that the law fixes that standard imposes it on the jury and likewise imposes on us the duty of ascertaining whether the evidence legally admits of the classification which the jury applies. While the jury is given the function of determining the facts upon the evidence it does not have the power of changing the standard.

Probably the most frequently cited and copied enunciation (in the courts of California) of differences between first and second degree murder is that of Chief Justice Sanderson in *People* v. *Sanchez* (1864), *supra*, 24 Cal. 17, 28-30. At the very outset of his definitive statement he says, *"In order to constitute murder of the first degree there must be something more than a malicious or intentional killing*. There must be a killing within one of the three classes of cases described in the statute as constituting murder of the first degree." He continues (p. 29): "In dividing murder into two degrees, the Legislature intended to assign to the first, as deserving of greater punishment, all murders of a *cruel and aggravated character;* and to the second all other kinds of murder . . .; and to establish a test by which the degree of every case of murder may be readily ascertained." After referring to those two classes of first degree murder

cases which are positively identified, in the first class by the means used (perpetrated by means of poison, lying in wait, or torture), and in the second class by the felony in the perpetration of (or attempt to perpetrate) which the homicide occurs, the Chief Justice's statement proceeds: "But there is another and much larger class of cases included in the definition of murder in the first degree, *which are of equal cruelty and aggravation with those enumerated,* and which, owing to the different and countless forms which murder assumes, it is impossible to describe [enumerate] in the statute. In this class the Legislature leaves to the jury to de-determine, from all the evidence before them, the degree of the crime, *but prescribes, for the government of their deliberations, the same test which has been been used by itself in determining the degree of the other two classes*—to wit: the deliberate and preconceived intent to kill. Thus the three classes of cases which constitute murder of the first degree are made to stand upon the same principle." (Italics added.)

In *People* v. *Cox* (1888), 76 Cal. 281, 286 [18 P. 332], in approving certain jury instructions it was said: "The general idea of the charge is, that if it is clearly proved the defendant killed the deceased, and the evidence does not show (it is unnecessary here to speak of the quantum of evidence necessary to show it) either that the killing was justifiable or excusable, or that the offense was manslaughter, *the crime is murder of the second degree,—unless the evidence manifests beyond reasonable doubt that the defendant deliberately and premeditatedly formed the intent to kill the deceased, and killed him to carry out that intent,* in which case it is murder of the first degree." (Italics added.)

In the more recent case of *People* v. *Howard* (1930), *supra,* 211 Cal. 322, 329, the applicable rule was succinctly stated: "To be murder of the first degree, under our statute, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, *the unlawful killing must be accompanied with a deliberate and clear intent to take life.*" (Italics added.)

▮ Is the evidence in this record sufficient to establish that the unlawful killing was accompanied with a deliberate and clear intent to take life? That the homicide is of equal cruelty and aggravation with those enumerated in the statute?

It does show that defendant acted without any reasonable necessity of self-defense. It fails to show sufficient provocation or suddenness of hot passion to reduce the homicide to manslaughter. It also indubitably establishes that the deceased was advancing toward the defendant; that the latter at close range fired one shot apparently not aimed at and which did not strike the deceased; that defendant then shouted a further warning, "Stay back, don't come any closer, or I will kill you"; that after the first shot was fired the deceased continued to advance although he apparently was in the act of stopping or turning at the precise moment the second shot was fired; that the second shot was fired and that the bullet, of small calibre, struck the deceased; that the deceased then stopped, turned, and walked around the train and to the station; *that defendant with eight loaded cartridges remaining in his rifle stopped firing when the deceased stopped advancing and that he then permitted the deceased to proceed to the station without further molestation.*

These last recited facts, established beyond question by prosecution witnesses, are, in the light of all the circumstances shown, overwhelmingly inconsistent with a deliberate, premeditated, and clear intent to take life. It is contended that they but create a conflict with the declaration of the defendant one hour and twenty minutes earlier that he was going "to shoot his [Riley's] God damn heart out and wipe it across his mouth." Of this threat, as previously noted, the prosecution witness who related it testified that he had not considered it serious. There was no reason for supposing that the first part of the threat was any more serious than the last part. And we cannot survey all the evidence in this record without the strong conviction that the witness was correct in his appraisal of the threat. It is certain that defendant did not literally carry out any part of his threat. He did not say that he intended to kill Riley. He said that he "was going to . . . shoot his . . . heart out and wipe it across his mouth." The very extravagance of that statement makes its value as proof of a deliberately conceived and premeditated intent questionable. The defendant did neither of those things, nor did he make any effort literally to carry out such extravagant statement. It has also been suggested that the statement of the defendant made to the witness Keever a few minutes before the shooting that "right now I am telling this brakeman

off" amounted to a declaration that he was even then in the course of carrying out an intentional homicide. On the contrary, such statement is apparently devoid of any value as proof of a deliberate, fixed design to take life. The expression "tell off" is a colloquialism meaning "To reprimand, denounce" (Webster's New International Dictionary, 1943 ed.) and is simply consistent with the defendant's rude and crabbed mood manifested throughout the day. As to the events immediately surrounding the shooting it is also certain that defendant warned decedent not to approach him and that he fired but one shot of small calibre into the body of deceased and then permitted him to walk away.

The above recited unquestioned facts we are as bound to reckon with as was the jury. As a matter of law the evidence, in the light of such facts, is insufficient to establish that the killing "was accompanied with a deliberate and clear intent to take life." Likewise, surveying all of the evidence in the record, and construing it favorable to supporting the judgment, we are unable to hold that it is sufficient, as a matter of law, to support the essentially implied conclusion that the homicide here was of "equal cruelty and aggravation with those enumerated" in the statute. It follows that the judgment of death for first degree murder cannot be sustained. We are satisfied, however, that such evidence warrants a judgment for murder of the second degree.

The defendant assigns and our examination of the record discloses no prejudicial error in the trial of the issue of his sanity.

The judgment of the trial court is modified by reducing it to murder of the second degree and as so modified is affirmed. The cause is remanded to that court with directions to pronounce judgment upon defendant sentencing him to be imprisoned in a state prison for the term prescribed by law for murder of the second degree.

Gibson, C. J., Carter, J., and Traynor, J., concurred.

CURTIS, J.—I dissent from that portion of the opinion which reduces the degree of the crime. In so reducing the degree of the crime, the majority disregards substantial prosecution evidence from which the jury, in my opinion, could reasonably infer, as it did, that the homicide was both intentional and premeditated. Prior to a discussion of the law

governing the case, a chronological narrative of the evidence introduced will assist in determining the propriety of the jury's verdict finding the murder to be of the first degree.

The homicide occurred on Monday, April 19, 1943, at a small railway station in Lassen County. Defendant was one of three telegraphers employed at the station. Deceased was a brakeman on a logger train. The evidence shows and the majority concedes, that preceding the homicide defendant had engaged in a series of disputes with other employees. He had ordered a fellow-telegrapher to stay out of the office when he (defendant) was on duty. On the afternoon preceding the homicide defendant had abandoned his telegraph station and as a result, was told he would have to resign or stand a formal investigation. This undoubtedly served to irritate him further. On the following morning defendant refused to accept a telegram from telegrapher Shields, who was then on duty, and called Shields a —— — ——. Defendant then stalked out of the office leaving the door open. It was closed by a third person and defendant challengingly returned to find out who had closed the door. As he stood in the doorway a train on which deceased was brakeman backed in. Defendant called to deceased who came over to find out what he had said. The prosecution witness Shields said he could not hear the conversation but it "looked like they may have exchanged a few words," and that he heard defendant say to deceased "he would say anything he wanted to to his face." Deceased returned to his train. Shields further testified that about an hour later defendant again came into the station and took a bundle of bedding. He had a gun with him at the time. The witness testified that the next time he saw deceased that morning he came into the station holding his stomach. He had been shot. Shields also testified to a prior disagreement between defendant and deceased based on the latter's use of coal from a bin near the station, and in reply to a query whether he ever heard defendant "make any statements with relation to anyone other than Riley," the witness replied, "Not that I know of" and that defendant's statements indicated "he was a little peeved at Riley for taking the coal."

Prosecution witness Hilton, a train engineer, testified he was in the station at Hall Flat on the morning of April 19th, when defendant came in and refused to accept the telegram

from telegrapher Shields. Defendant threw the message on the floor and left the door open as he departed. The witness closed the door and defendant returned demanding to know who closed the door, and stating ''Well, I am running things around here and I want you to understand none of you trainmen are going to have anything to do with it.'' The witness saw defendant in the station a little later in the morning and he had a rifle. When questioned as to defendant's sobriety and whether he was ''able to walk around and talk coherently,'' the witness replied, ''Absolutely all right.'' Shortly after defendant left the station, deceased was shot.

Witness Ferguson, who was conductor of the train on which deceased was brakeman, testified that he came into the Hall Flat station to register-in his train when he saw and heard defendant angrily refuse to accept the telegram from the telegrapher on duty. Defendant told the witness in a hostile tone that he was all through with the railroad ''and anybody that works for them.'' About an hour or so later as the witness left his train to again enter the station he saw defendant standing by the tracks holding a rifle. Defendant told Ferguson ''to go over by a big tree and pull it up and get in the hole.'' When he came out of the station defendant was gone but the witness learned defendant had just shot the deceased who had come in on the train. The shooting occurred within three or four minutes after defendant had told the witness to jump in a hole in the ground. The witness also related that prior to the shooting, defendant was ''pretty peeved'' at all the trainmen, *and particularly deceased,* because they had used coal (as they had a right to do) from the bin near the station, which coal was also used to heat the station. When interrogated on cross-examination as to defendant's sobriety the witness replied, ''Well, he just seemed to be angry. . . . Didn't seem as though he was under the influence of liquor, . . . He was just cranky, and looked like he had a chip on his shoulder for anybody that would argue with him, or talk to him. . . .''

Dorithy, the engineer of the train on which deceased was brakeman, testified that at approximately 10:30 o'clock on the morning of the shooting, defendant walked from the station to the train with a message blank in his hand and the witness thinking it contained instructions for them stopped the train, got out on the ground and asked defendant ''what

he had for us." Defendant asked, "What is the matter with Riley [deceased], is he trying to get tough around here." The witness replied there was "nothing the matter with Riley, for him to leave Riley alone, and Riley wouldn't bother him," whereupon defendant said "he was going to go home and get his gun, and shoot his [Riley's] God damn heart out and wipe it across his mouth." The witness said the train then left the station, with deceased aboard, and returned about one hour and twenty minutes later, when defendant shot deceased. On cross-examination the witness stated that when defendant said he was going to get his gun and shoot Riley's heart out, "he did sound serious" and the witness "didn't think he was drunk." In fact, the witness said defendant's mannerism was no different than on other occasions, that defendant was changeable—being affable at times and "moody" and "quarrelsome" at other times.

The witness Damaske, a brakeman on the train, testified that after he had thrown the switch for the train he met defendant on the tracks coming toward the train and carrying a rifle. In response to the witness' salutation, defendant said "Some of these old —— — ———— around here had better mind their own damned business." It was deceased's duty to re-align the switch and the witness added he did not see either the deceased or defendant again until after the shooting. At the time, defendant "walked and everything else, just like he always did."

Cox, the fireman on the train, testified he saw defendant near the switch-stand holding a rifle. Deceased was at the switch-stand to realign the switch. When the train rounded a curve the witness lost sight of the parties but within a few minutes he learned that defendant had shot deceased. The witness was never close enough to defendant on the morning of the shooting to form an opinion as to his sobriety.

The witness Keever, also a locomotive fireman, testified that as he was walking to work he saw defendant standing in the dirt road near the switch holding a rifle and deceased was on the opposite side of the track leaning on the rear car of the train; that in response to the witness' inquiry as to how everything was going, defendant replied "O.K., but right now I am telling this brakeman off." *The witness heard deceased tell defendant "to take his gun and his dogs and go on about his business, that he didn't have time to be bothered with*

*him.''* When the witness had walked about 50 feet he heard ''the rifle crack,'' turning he saw defendant holding the gun in both hands and heard him say to deceased who was then at the switch-stand, ''Stay back, don't come any closer, or God damn you, I will kill you,'' whereupon ''practically instantaneous'' he fired a second shot at deceased who grunted and held his stomach. At the time of the shooting deceased was approximately fifteen feet from defendant. The witness stated deceased had nothing in his hands at the time ''other than his gloves. He had his gloves on.'' On cross-examination the witness stated that *previous* to the firing of the second shot deceased ''was facing in the direction of Mr. Holt [defendant] and going in that direction *as well as in the direction of the switch-stand''* where, as shown, he was to realign the switch. The witness further testified that when the second and fatal shot was fired deceased ''was right in the *very act of turning . . . towards me . . .* and he was in a rather bent-over position, slightly, as though he was dodging something, or trying to duck . . .''—a perfectly natural reaction following the firing of the first shot by defendant. As to defendant's sobriety, the witness stated that when he first saw defendant on the morning of the homicide, which was some two and one-half hours *before* the shooting, defendant ''was intoxicated'' but the witness added, *''it was hard to judge or observe, and say definitely as to his condition''* at the time of the shooting, though the witness was of the *opinion* that the intervening period ''wouldn't have been a reasonable time to sober up in.'' On the redirect examination of the witness, however, the following appears:

''Q. Before recess for the noon hour you gave an opinion as to the sobriety or intoxication of Mr. Holt, did you not? A. I believe I did.

''Q. And you stated that you based that opinion entirely upon your seeing Mr. Holt *earlier* in the morning? A. Yes.

''Q. *Was there anything in Mr. Holt's actions or appearance while he was there in the road, immediately before the shooting that would indicate that he was intoxicated?* A. *No, I can't say there was, because there was no indication as regards his intoxication.*

''Q. *Your opinion is based on events that transpired—your seeing him earlier in the day?* A. *Entirely.*

''Q. Are you a drinking man yourself? A. I have nothing to do with it.

"Q. I would like to ask you this question. *What did you see or what did you hear that caused you to think that Mr. Holt was intoxicated when you saw him in the morning?* You talked to him in the morning, did you? A. Yes.

"Q. And walked up to his cabin with him? A. Yes.

"Q. And you were present when these events took place between Shields and Mr. Holt and between Hilton and Holt? A. Yes, I was in the station, right in the very room at the time it occurred.

"Q. *Did you notice any impediment in his manner of speaking?* A. *No.*

"Q. *When he walked up the road with you did he stagger?* A. *No, there was no—it was purely his attitude, his antagonistic attitude that I based that statement on. I didn't see him take a drink, and he walked about as straight as I did.*

"Q. *Did you smell liquor on him at that time?* A. *No.*" (Italics added.)

The sheriff who took defendant into custody testified that defendant said he shot deceased "because he called me dirty names. . . . He had it coming. . . . Sheriff, I would shoot you if you called me dirty names." Defendant did not tell the witness that deceased approached him with a stick or any other weapon. On cross-examination, the witness stated that when he arrested defendant at 2:30 o'clock in the afternoon, *several hours after the shooting,* defendant "was moderately intoxicated." (But, as will later appear, defendant and his wife testified he had consumed some whiskey *after* the shooting and before the arrest by the sheriff.)

Defendant took the stand in his own defense and testified that he had voluntarily imbibed intoxicants both before and after the homicide, which condition, he asserted, caused his memory to be hazy, if not a blank, as to some of the events. (The evidence of the prosecution witnesses, already stated and as later developed in rebuttal, definitely tends to establish that defendant was not intoxicated at the times and places covered by their testimony.) Defendant did recollect and admit, however, that he had ordered a fellow-telegrapher to stay out of the station during his (defendant's) shift. He also admitted having refused to accept the telegram from the telegrapher on the morning of the homicide and also recollected going back to inquire who had closed the station door after he had departed leaving it open. After relating a story which

tended to establish that the most cordial relations existed between him and deceased, defendant testified that on the morning of the homicide deceased, after assertedly saying he was glad defendant lost his job, and without apparent provocation, advanced toward him with a brake-stick or club. At no time, however, according to defendant's own testimony, had deceased wielded the stick in defendant's direction nor was he at any time close enough to strike him with the stick. In fact, while deceased was still some 15 feet from him, defendant fired two shots, one of which killed deceased. While admitting that deceased had not struck at him and was at no time close enough to hit him, defendant also admitted that he fired the gun without making any attempt to back up or to otherwise avoid the shooting. After the shooting, defendant admittedly made no effort to look for or retrieve the stick or club assertedly held by deceased. The only attempted refutation of the many incidents and statements testified to by the long array of prosecution witnesses, was offered by the defendant himself. The jury by its verdict rejected his testimony insofar as it conflicted with the prosecution showing. It is not within the power of an appellate court to overturn the jury's implied findings based on substantial evidence and the inferences reasonably deducible therefrom.

Defendant's wife testified that after the shooting she was walking in the general vicinity and picked up a "stick" which she used as a cane. The "stick" was introduced in evidence though defendant was unable to identify it as the "club" assertedly held by deceased. The wife stated that when defendant came into the cabin immediately after the shooting he did not mention that deceased had a stick or club in his hands. She also testified that he drank some whiskey after returning to the cabin following the shooting—such drinking *subsequent* to the shooting might well account for the "moderately intoxicated" condition of defendant testified to by the sheriff when he arrested defendant several hours later. The wife further testified that when defendant left the cabin with the gun she "didn't feel that he was so intoxicated that he wouldn't be able to handle the gun."

The prosecution called the following several witnesses in rebuttal: The sheriff testified he had searched the vicinity of the shooting (which was prior to the time defendant's wife said she found the stick) and that he did not see there a

stick or club resembling the one placed in evidence. Damaske, the brakeman, testified that at no time during the switching operation which immediately preceded the shooting did he see a stick or club in deceased's hands and that he did not notice a stick on the ground resembling the one in evidence. One of the other trainmen also testified that at no time did he see a stick or club in deceased's hands. Keever, recalled in rebuttal, testified that between the first and second shots he had a full view of deceased who was never out of his sight and he did not have a stick or club in his hands. This witness said, "I am telling you I seen both hands and if that stick, or any other stick like it, had been in his hands I would have seen it. . . . No, sir, it wouldn't have been possible for him to have that stick in his hands and I not seen it."

The superior court reporter, who had reported a statement made by defendant to the district attorney and others, testified that defendant when asked if he was intoxicated at the time of the shooting, replied "No, hell, no"; and that when asked if deceased had anything in his hands, he responded, "I don't know whether he had a brake club or not; but I know when he said so-and-so, and started towards me, I guess that is when I blowed my top. . . . He said some bad words that wasn't nice for him to say."

Section 189 of the Penal Code declares that "All murder which is perpetrated by means of poison, or lying in wait, torture, *or by any other kind of willful, deliberate, and premeditated killing,* or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, *is murder of the first degree;* and all other kinds of murders are of the second degree." The evidence, briefly outlined above, is sufficient to support the jury's implied finding that the killing of Riley by the defendant was "willful, deliberate, and premeditated" and therefore murder of the first degree as defined in the code section. The existence of a deliberate purpose to kill may be inferred from the character of the weapon used, the circumstances surrounding and showing the relationship of the parties, and the acts and conduct of the accused. (*People* v. *Cook,* 15 Cal.2d 507, 514 [102 P.2d 752] ; *People* v. *Smith,* 15 Cal.2d 640, 647 [104 P. 2d 510] ; 13 Cal.Jur. 597, § 14.)

In *People* v. *Mahatch,* 148 Cal. 200, 202-203 [82 P. 779], it is stated that defendant "assumes that it was necessary that

there should have been express evidence of a deliberate purpose to kill in order to warrant the verdict as returned. But this was not necessary. It could be inferred from proof of such facts and circumstances in the case as would reasonably warrant an inference of its existence. The defendant did not deny that he killed Confaglia. He claimed on the trial that he was so intoxicated as to know nothing about the killing. . . . The jury, having found that the only extenuating circumstance which he interposed had no existence in fact, and no claim of any circumstances of mitigation, justification, or excuse for the killing being advanced, had a right to infer, from the character of the weapon used, the nature of the wound inflicted, and the acts and conduct of the accused, the existence of a deliberate purpose on his part to kill the deceased when the fatal blow was struck, and, so inferring, were warranted in returning a verdict therefrom for murder in the first degree. This is the general, it may be said the universal, rule. If a different one prevailed, secret murders could rarely be punished by the infliction of the highest penalty. It is exclusively the province of a jury to determine the degree of crime when there is any evidence in the case which will support the determination. We are satisfied that in the case at bar there was sufficient evidence to warrant the jury, within the rule we have stated, in inferring the existence of a deliberate intent to kill. They so found and awarded the highest penalty, and their finding was approved by the trial judge on the motion for a new trial. This is conclusive upon the subject and upon us, as we can only disturb a finding when we can say, as matter of law, that there was no evidence to support it.''

*People* v. *Machuca,* 158 Cal. 62, 64 [109 P. 886], states that ''There was also evidence that the defendant had, on the day prior to the killing, made a statement that the jury might fairly have interpreted as constituting a threat against the life of the deceased. This court has repeatedly declared that the question of the degree of crime is exclusively for the jury, and that their determination will not be disturbed when there is any evidence to support it. (*People* v. *Bowman,* 81 Cal. 566 [22 P. 917]; *People* v. *Bruggy,* 93 Cal. 476 [29 P. 26]; *People* v. *Worthington,* 122 Cal. 583 [22 P. 396]; *People* v. *Mahatch,* 148 Cal. 200 [82 P. 779].). . . It is not necessary that there should be express evidence of a deliberate purpose

to kill. 'It could be inferred from proof of such facts and circumstances in the case as would reasonably warrant an inference of its existence.' (*People* v. *Mahatch*, 148 Cal. 200 [82 P. 779].) That the deliberation which must precede the killing in order to make the murder one of the first degree need not have existed for any given length of time is thoroughly settled. (*People* v. *Bealoba*, 17 Cal. 389; *People* v. *Sanchez*, 24 Cal. 17; *People* v. *Hunt*, 59 Cal. 430; *People* v. *Mahatch*, 148 Cal. 200 [82 P. 779].) This being so, it cannot be doubted that the evidence here introduced fully justified the jury in finding the killing to have been deliberate and premeditated. There was to be sure, the testimony of the defendant and other witnesses contradicting the showing made by the prosecution, but it cannot be necessary to cite any authority to the effect that the action of the jury in accepting as true either of two conflicting statements presents no ground for the reviewing power of the appellate court.'' This language is quoted with approval in *People* v. *Bellon*, 180 Cal. 706, 710 [182 P. 420]. That no appreciable time need elapse between the intention to kill and the act of killing and that they may be as instantaneous as successive thoughts of the mind, see, also, *People* v. *Cook*, 15 Cal.2d 507, 514 [102 P.2d 752]; *People* v. *Aranda*, 12 Cal.2d 307, 310 [83 P.2d 928]; *People* v. *French*, 12 Cal.2d 720, 745 [87 P.2d 1014]; *People* v. *Patubo*, 9 Cal.2d 537, 540 [71 P.2d 270, 113 A.L.R. 1303]; *People* v. *Dale*, 7 Cal.2d 156, 159-160 [59 P.2d 1014]; *People* v. *Garcia*, 2 Cal.2d 673, 683 [42 P.2d 1013]; *People* v. *Fleming*, 218 Cal. 300, 310-311 [23 P.2d 28].

The following appears in the case last cited:

''Under the contention that the evidence fails to show premeditation or deliberation on the part of the defendant in the killing of the deceased, appellant in his brief says, 'there is an entire lack of evidence either direct or circumstantial in nature consisting of facts proven from which the jury might have reasonably or logically inferred that the killing was wilful, deliberate or premeditated'. With this statement we cannot agree. It is true that no great interval of time elapsed from the time the deceased pushed the defendant through the door until the defendant drew his gun and shot the deceased. But this court has said on innumerable occasions that in order to prove premeditation in one charged with murder it is not necessary to show that any appreciable space of time elapsed between the intention to kill and the act of killing. It is only

necessary to quote from *People* v. *Hunt*, 59 Cal. 430, 435, the following statement of the law on this subject: 'There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing.' The precise language of this decision has been repeated on numerous occasions by this court and the principle there enunciated is irrevocably established as a part of the law of this state. (*People* v. *Bellon*, 180 Cal. 706, 710 [182 P. 420].) In the instant case, while the testimony, already quoted shows that the defendant shot almost, if not immediately, after the two men went through the door, still there was time for the defendant to think before he acted, to deliberate between the intention to kill and the act of killing. Defendant had time to draw his gun and fire the shots. He formed the intention to draw his gun, and then acted upon that intention. He drew his gun with some intention—either to defend himself, to frighten the deceased or to kill the deceased. After forming the intention, whatever it was, he acted upon it by firing his gun. He thus had time to think and to act. This is all that is necessary in order to show premeditation.''

The majority opinion recognizes that the overwhelming weight of the evidence, including defendant's own testimony and extrajudicial statements, demonstrates that he was not an innocent person suddenly confronted with imminent danger of bodily harm. On the contrary, it is admitted he had been going about with a ''chip on his shoulder'' for at least a day prior to the homicide. By his quarrelsome and challenging attitude defendant thus created an atmosphere of antagonism, the majority concedes, that ''might naturally lead to physical combat if he continued, as he did, in his quarrelsome pursuit of trouble.'' By his objectionable and challenging attitude he thus set the stage for the shooting which he ultimately perpetrated. In view of the conflict in the evidence, the majority opinion also recognizes, as it must, that defendant's account of the shooting is not presently material to a consideration of the degree of the offense. By its verdict the jury resolved all conflicts against the defendant and ac-

cepted the strong prosecution showing as to the circumstances and conditions which prevailed both before and at the time of the shooting. Under the settled rule, this court may not therefore disregard the jury's verdict. Yet, in the face of this fundamental principle and *despite the existence of prosecution evidence to.the contrary,* the majority opinion states that on the day preceding the homicide defendant "apparently had been drinking heavily" and "had reached a stage of stupefaction" when arrested a few hours after the shooting. The prosecution evidence, quoted herein, and apparently accepted by the jury, absolutely refutes both statements. To illustrate briefly: The majority opinion in narrating the evidence of engineer Hilton as to defendant's quarrelsome attitude on the day preceding the homicide, fails to mention that the witness when interrogated as to defendant's sobriety at the time testified he was "absolutely all right." In refutation of defendant's asserted condition of "stupefaction" at any time of the day of the homicide, reference may be had to the testimony of conductor Ferguson who said defendant "just seemed to be angry . . . didn't seem as though he was under the influence of liquor." Engineer Dorithy testified that when defendant said he was going to get his gun and shoot deceased's heart out, "he did sound serious" and the witness "didn't think he was drunk." Brakeman Damaske testified that when he met defendant coming toward the switch with the gun defendant "walked and everything else, just like he always did." Fireman Keever on redirect examination testified that immediately before the shooting "there was no indication as regards his [defendant's] intoxication," that he did not stagger, that there was no impediment in his speech and no smell of "liquor on him at that time." The sheriff testified that when he arrested defendant a few hours after the homicide he was only "moderately intoxicated"—caused undoubtedly by his admitted consumption of whiskey *after* the shooting. In the face of this positive prosecution evidence to the contrary, the statement of the majority that defendant's condition on the day of the homicide (either before or after the shooting) was one of "stupefaction," cannot be supported. It is based on defense evidence which was rejected by the jury in the face of overwhelming evidence to the contrary.

The majority also attempts to minimize defendant's threat against the life of deceased made one hour before the shooting by characterizing it as an "extravagant" statement which

defendant made no "effort literally to carry out." Certainly, a threat to "shoot [deceased's] God damn heart out and wipe it across his mouth" was most *effectively* executed by defendant's fatal shooting of deceased one hour later. The majority while stating that the prosecution witness who heard the threat did not consider it to be "seriously meant," recognizes that the witness on cross-examination testified that when he made the threat the defendant "did sound serious." The majority improperly assumes the function of the jury and minimizes the prosecution evidence while emphasizing the meager defense showing. In so doing, it has usurped the power of the jury.

The majority opinion next seeks support for its reduction of the degree of the homicide in the fact that defendant for some time preceding the shooting had shown ill feeling toward others than the deceased. Ferguson testified, however, that defendant was "particularly" peeved at the deceased. Aside from this, it is difficult to perceive how defendant's quarrelsome attitude and ill-will toward several persons, *including deceased*, can serve to reduce the degree of the homicide resulting from the intentional and premeditated shooting of deceased, particularly when an hour before the shooting defendant had threatened to "shoot [deceased's] God damn heart out and wipe it across his mouth." Certainly, if defendant had killed *all* of the group with whom he had quarreled, it could not be successfully argued that because of his capacity to harbor ill-will against *many* the resulting killings would not constitute murders of the first degree. It is axiomatic that the greater includes the less and it seems too plain for argument where, as here, defendant's display of ill-will *included deceased*, and was coupled with a threat against deceased's life, that the jury might reasonably infer, as it did, that the ultimate execution of the threat was both intentional and premeditated. And having so concluded on substantial evidence, this court is powerless to disturb its verdict.

Moreover, the majority in seeking support for its reduction of the degree of the crime by referring to defendant's display of ill-will toward others than the deceased, loses sight of the rule that *"it is the law of this state that in order to sustain a conviction of murder* [of the first degree] *it is not necessary to show personal enmity on the part of the defendant against the deceased."* (*People* v. *Fleming*, 218 Cal. 300, 309 [23 P.2d 28]; *People* v. *Sainz*, 162 Cal. 242 [121 P.

922].) This being so, the majority's emphasis of defendant's asserted lack of enmity toward deceased is not only unwarranted under the evidence but wholly immaterial.

The Sainz case, *supra*, presented a factual situation substantially identical with that stressed by the majority herein (but rejected by the jury) as requiring a reduction of the degree of the crime, nevertheless the decision in that case affirmed a judgment of murder of the *first* degree. The decision in that case states (p. 243): "Defendant was sheep-shearer and a member of Santos Carrissosa's sheep-shearing camp, which contained twenty or thirty Indians and Mexicans. The deceased, Jose Machado, was likewise a member of the camp. The camp was composed of two tents or encampments, one known as Carrissosa's tent, where Machado lived, the other known as Mirando's tent. The sheep-shearing was over. The defendant began to drink, became somewhat intoxicated, and fell into an ugly and quarrelsome mood. With his sheep-shears he went to the entrance of Carrissosa's tent and challenged the *occupants generally* to come out and fight him. Thereafter he took his Winchester rifle and began shooting at a can upon the ground, firing six or eight shots, and declaring that 'this is the way I am going to kill *one or two tonight.*' He then, still carrying his rifle went into the Mirando tent, stumbled over some harness, fell down, got up and asked who had pushed him. Being told that nobody had, he said 'I'll go out and kill *two or three.*' He walked outside and began firing his rifle. He discharged three shots, the third striking Machado, who was standing at the entrance of Carrissosa's tent, a short distance away, killing him instantly. . . . Appellant's contentions against the sufficiency of the evidence resolve themselves into two propositions: 1. That he was drunk at the time of the shooting, that there is no proof of malice on his part toward or against Machado, but no enmity between them is shown to have existed and there was therefore no motive for the crime; . . . The evidence leaves little doubt but that the defendant's ugly passions were aroused by the liquor which he voluntarily drank, that, as the Indians phrase it, 'his heart was bad.' *There is no evidence of personal enmity or hostility on the part of defendant against the deceased, but there is evidence that his blood lust had been aroused and that he was willing to slay, and did slay, without provocation. This evidence clearly indicates malice. Whether it be called*

*express or implied (Pen. Code, sec. 188) is immaterial. There is enough to justify the jury in finding that he stepped to the door of the tent with the deliberate intention unlawfully to take human life, and, upon the other hand, there is enough to support the finding that there was no provocation at all, and that the circumstances attending the killing showed an abandoned and malignant heart.* Of course, his voluntary intoxication was no excuse for his crime (Pen. Code, sec. 22), and the question whether by reason of that intoxication he was incapable of forming a specific criminal intent was one for the jury to pass upon under proper instruction, which the court gave, and they decided the question against him. There was no motive for the crime in the sense that it was shown to have been for revenge or the outgrowth of pre-existing hostility, but while evidence of motive is always permissible and ofttimes valuable, it is never essential to the proof of a crime. (*People* v. *Durrant,* 116 Cal. 179 [48 P. 75].) Yet, in another sense, motive sufficiently appears. The act was the expression of a mind inflamed by intoxicants, brutal, malignant, and on murder bent.'' (Italics added.)

The foregoing quotation furnishes ample support for the jury's implied finding that the fatal shooting of Riley was both *intentional and premeditated* within the statutory definition of murder of the first degree.

In *People* v. *Howard,* 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385], wherein the degree of the crime was reduced, the court stated, ''there is a *dearth* of evidence tending to show the conditions as they existed at the time of the homicide, and from which it might reasonably be held that the murder was, in fact, wilful, premeditated and intentional. In this regard, the state failed to satisfy the burden of proof.'' This is not true in the instant case. Here, there is an abundance of evidence showing the circumstances that existed both before and at the time of the homicide. Defendant was quarrelsome for a day preceding the homicide; he was ''particularly'' peeved at deceased; he threatened to go home and get his gun and shoot deceased's heart out; he did get his gun and he did fatally shoot the deceased approximately one hour later; and the majority recognizes that ''The overwhelming weight of the evidence, including defendant's own testimony and extrajudicial statements, establishes that defendant was not an innocent person suddenly confronted with imminent danger of great bodily harm'' but ''by his quarrelsome and

challenging attitude, not only toward deceased but others . . . had created an atmosphere of antagonism that might naturally lead to physical combat." It is difficult, in the face of the evidence and such a statement, to justify the conclusion of the majority that the jury could not find the killing to have been intentional and premeditated.

I am satisfied that the evidence overwhelmingly supports the jury's verdict that the murder was of the first degree. As conceded in the majority opinion, the appraisal of the evidence "is primarily a jury function and within a *wide field of discretion* its determination is *final*." In the face of the substantial prosecution showing, the jury did not abuse the discretion confided to it and, under settled principles, its verdict should stand undisturbed by this court.

Shenk, J., and Edmonds, J., concurred.