[Crim. No. 3912.  Second Dist., Div. Three.  Dec. 12, 1945.]

THE PEOPLE, Respondent, v. JOHNNY CARR, Appellant.

192

Walter L. Gordon, Jr. for Appellant.

Robert W. Kenny, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

SHINN, J.—At about 2 o'clock in the morning of June 19, 1944, Johnny Carr entered the Swing Shift Cafe in Los Angeles, armed with a revolver, and shot and killed one Frank Williams. Also struck by a bullet at the same time was one Richard Swanson. Accused of the murder of Williams and of assault with a deadly weapon upon Swanson, defendant was convicted of both offenses in a trial by the court. The court determined that the murder was of the first degree and defendant was sentenced to state prison for life upon the murder charge and for the term prescribed by law upon the other. He appeals from the judgment.

The grounds of the appeal are as follows: (1) insufficiency of the evidence to sustain the conviction of first degree murder; (2) insufficiency of the evidence to establish the fact that deceased died as a result of a criminal agency, and (3)

insufficiency of the evidence to support the conviction of assault with a deadly weapon.

Defendant, a Negro, and Velma Carr, a Creole, although not united by ceremonial marriage, lived together in Texas as husband and wife for two years or more before coming to Los Angeles in 1939. They continued to live together and operated a cafe but they separated about two months before the shooting and defendant thereafter ran the business alone for another six weeks, when he sold it. After the separation Velma was frequently in the company of Williams, when they made use of a car which defendant was purchasing for Velma. During this time Williams, who had been a customer of defendant, carried messages between the two. On the night of the shooting Williams and Velma alighted from the car and entered the Swing Shift Cafe with one Cathcart. They seated themselves to have coffee, Velma sitting between the two men at a counter. Defendant was standing outside the door when the occupants alighted from the car and he saw the three enter the cafe. He said to a friend called Buddy: "You know one thing I wish I had me some tonight. You know where I can buy me a gun? I got to protect myself. Somebody trying to run over me." Buddy then produced a .45 caliber Smith & Wesson revolver and defendant bought it for $20 and put it in his pocket. He testified that this occurrence took place before Williams and Velma arrived. Shortly after they entered the cafe defendant followed them with the revolver in his pocket and sat down at the counter near the door. According to defendant, Williams began cursing him, calling him names, jumped up and reached toward his belt for a knife, as defendant thought, whereupon he was shot. According to other eyewitnesses defendant came into the cafe and, without any exchange of words which they heard, walked up to Williams where he was seated facing across the counter and shot him. One bullet entered the left side of the body below the left shoulder and passed across slightly forward and slightly upward; the second entered the right cheek just below the cheek bone, crossing downward and lodging beneath the seventh rib, and a third one grazed the cheek close to the second wound but did not penetrate. Either of the penetrating wounds was sufficient to have caused death. The witness Cathcart testified that Williams fell to the floor between the stools at the first shot and that defendant put the

revolver close to his head and continued to shoot and that there must have been five shots fired. Defendant immediately left the cafe, threw away the gun and went home, but later surrendered to the sheriff's office. He testified that he recalled firing only two shots but there was evidence that the gun was found by the officers and was then empty. When the body of Williams was removed from the floor an unopened pocket knife was found in a vest pocket.

Defendant testified that Williams had a house on Avalon Boulevard where he sold whiskey and ran a crap game; that he had women around the place and that after the separation Velma was often there, leaving her car standing in front of the house; that he saw her make dates with men in bars and later meet them at Williams' place, which she would enter first and the men later through the rear door; that after the separation he talked to her about her conduct and accused her of being a prostitute. In testifying to his feelings in the matter, he said: "No, I wasn't mad at anybody taking her away from me, but I didn't like the way he was using her out in the street, making a prostitute out of her." He testified that he had lived with her "on or off for eight or ten years" and that he still loved her; that on many occasions Williams had taunted him and had addressed to him many obscene and jeering remarks, and that upon one occasion Williams and Velma, driving the latter's car, had almost run over him and his brother as they were crossing the street and that upon other occasions they drove past his place and turned a spotlight upon him. He testified that Williams had said that he would kill him, defendant, but did not testify that he had heard the statement made and the remarks which he attributed to Williams as having been addressed to him, directly, contained no threats. He did not testify to any threat by Williams on the evening of the shooting. According to his account, as he sat in the cafe Williams and Velma were looking toward him and Williams said: "What the damn people sitting around this time of night eye balling people going on for? . . . Sitting around watching. They ought to be at home asleep. They got to work. Sit around all night eye balling people and going on." To which defendant testified he replied: "I asked him why did he keep on cursing me and going on. I am not bothering him. Why didn't he go on and let me alone." Counsel for appellant, after

reciting the evidence substantially as we have stated it, says: "The prosecution has failed to raise the degree of the crime from second to first degree murder as defined in the Penal Code. There is no evidence in the record where it can be reasonably inferred that the murder was willful, deliberate and premeditated," citing, without discussing, *People* v. *Holt* (1944), 25 Cal.2d 59 [153 P.2d 21], and *People* v. *Thomas* (1945), 25 Cal.2d 880 [156 P.2d 7]. The elements of deliberation and premeditation which were found to be wanting in the Holt case, by reason of which the offense was reduced from first to second degree murder, are not absent in the present case. There is nothing in the exposition of the law relating to murder in the Thomas case which furnishes support for the argument of defendant. It appeared by his own testimony that he had a grievance against Williams which was aggravated by the continuous course of conduct of Williams and Velma and by the frequent taunts and abuse of the former. His testimony established a motive for the killing. He expected trouble when he entered the cafe and prepared himself for it. There was evidence that he shot Williams in cold blood as he was seated at the counter and he continued shooting as Williams lay on the floor, until he had emptied his gun. We are asked to hold, contrary to the finding of the trial judge, that when defendant purchased the revolver and entered the cafe it was not his deliberately formed purpose to kill Williams but only to act in self-defense; in other words, that the shooting was wholly unpremeditated. Such a conclusion of fact would be contrary to the evidence and the reasonable inferences deducible therefrom. We do not see how the trial judge, upon a consideration of the evidence, could have found that defendant's acts were not deliberate and premeditated. His resentment toward Williams was not the result of sudden impulse and he had had much time to reflect upon the conduct of Williams, which he believed to be responsible for the loss of the woman with whom he had lived, and for her debauchery. The encounter with Williams on the night of the shooting was sought by defendant and the results of it are proof of the purpose which he had in mind. The conclusion that the killing was willful, deliberate and premeditated is fully sustained by the evidence.

The contention that there was no evidence that Williams' death was caused by the shots which defendant fired

is not sustainable. The information charged the murder of Frank Williams. It was stipulated that Doctor Webb, Chief Autopsy Surgeon of Los Angeles County, if called as a witness, would testify that on June 19, 1944, he performed an autopsy upon the body of Frank E. Williams and that the cause of death was gunshot wounds. Under the stipulation the autopsy report was received in evidence. Defendant's point is that there was no evidence that Frank Williams named in the information was the Frank E. Williams whose body was the subject of the autopsy. Autra Williams, widow of Frank Williams, was called as a witness and testified that she had seen the body of her husband in the morgue. It was stipulated that the body was that of her husband and also that her husband was the Frank Williams named in the information. This evidence was clearly sufficient to prove the killing of Frank Williams as charged in the information.

█ The final contention to be considered is that the evidence was insufficient to prove an assault with a deadly weapon upon Richard Swanson. This victim of the shooting was not called as a witness, but others testified that he had been seated next to Williams, conversing with him, at the time of the shooting. One witness testified that "there was another fellow hit too" and that he "heard his name was Richard Swanson." When questioned as to whether he appeared to have been injured, he answered, "Yes, he was injured." He testified further: "Q. By Mr. Lynch: What happened to the other man that was shot? A. Oh, he was shot—— I think he was hit in the arm, or some place near the shoulder, and some lady taken him to the hospital." Another witness was questioned whether he saw Mr. Swanson there, "a gentleman who had been shot in the arm" and answered, "Yes, he was there." A police officer, testifying to statements of defendant, was asked: "Was anything said about any one else getting injured in the shooting?" and he replied, "He [defendant] mentioned that there was a man on either side of Velma and that one of the men was shot in the arm." While this evidence of the shooting of Swanson was somewhat vague, it was sufficient. It came in without objection. Defendant did all of the shooting that was done upon the occasion and he did not deny having shot Swanson. The court correctly found from this evidence that Richard Swanson was present and that he was injured by one of the bullets. █ The fact that

defendant did not intend to shoot him would not have been a good defense. (*People* v. *Ramirez* (1923), 64 Cal.App. 358 [221 P. 960].)

The judgment of conviction is affirmed as to both counts.

Desmond, P. J., and Wood, J., concurred.